## MERCER *v.* LEIHY.

1. AUCTIONEERS—LIABILITY—DISCLOSURE OF PRINCIPAL.
    Where an auctioneer discloses the fact of agency and his prin-
    cipal, the law presumes that he does not contract upon his
    own behalf, but for the principal.

2. SAME—SALE OF STOLEN PROPERTY—IDENTITY OF PRINCIPAL.
    Where, in an action to recover money paid to an auctioneer
    for stolen horses sold by him, the evidence indisputably
    showed that the auctioneer's principal was present at the sale,
    and identified himself in plaintiff's presence by stepping out
    from the crowd on being called on to do so by the auctioneer,
    the sufficiency of such identification to relieve the auctioneer
    from personal liability was a question of fact, though he
    failed to disclose the principal's name.

Case made from Wayne; Brooke, J.    Submitted Feb-
ruary 17, 1905.    (Docket No. 178.)    Decided March 21,
1905.

Assumpsit by George Mercer against George W. Leihy
and another for an alleged breach of warranty on the sale
of certain horses.    There was judgment for defendants,
and plaintiff appeals.    Affirmed.

*Louis E. Howlett*, for appellant.

*Seward L. Merriam*, for appellees.

HOOKER, J.    Coombs stole some horses, and brought
them to defendants' auction rooms, where they were sold
at auction to the plaintiff, who afterward sued the auc-
tioneers to recover the money paid, and a judgment of no
cause of action was rendered by the circuit judge before
whom the case was tried without a jury.    Plaintiff ap-
pealed, and alleges error upon the finding of fact that the
auctioneers sufficiently disclosed their principal to relieve

themselves from liability.   The testimony upon this subject is as follows:

George Leihy said:

"I believed that the property brought there by Coombs belonged to him.   I had no knowledge that the title to them was in any manner defective.   I made no representation whatever as to the title of these horses.   When I was selling them Mercer and Lane were bidding on them, and the bidding got dull.   I didn't know but the audience might think that Mercer and Lane were bidding on their own horses.   I called the attention of the people in the audience that they were not Mercer and Lane's horses, and I told the public: 'These are not Mr. Mercer and Lane's horses.   They belong to another party,' and I looked around and I didn't see the man in the audience, and I said, 'Where is the man who owns these horses?'   The man stepped out.   He was talking with Mr. Lane, and said, 'Here I am.'   Lane was the plaintiff's partner.   I saw Mr. Lane talking with Coombs both before and during the sale.   I did not hold myself out in any way as a principal, and I did not sign my name to any receipt for money or any bill of sale.   I received the money—$111.50— from Mr. Mercer, and held it until 3 o'clock of the next day after banking hours.   Then I gave Mr. Coombs my check for the amount, less my commission of 5 per cent."

On cross-examination he said:

"'Here are a pair of horses which came in from Ann Arbor this morning; consigned horses.'   Nothing more was said until the bidding became slow, when I said that: 'These are not Mercer's horses.   They belong to another man.'   I had every reason to think they belonged to Coombs.   Mercer made several bids.   I did not point Coombs out.   When I called for the owner, Coombs said, 'I am the man,' or 'I am the one.'"

Redirect examination:

"Before the horses were sold, I stated that the buggy came with them."

George W. Leihy, Jr., said:

"I did not know Coombs, but had seen him once or twice before.   Didn't know anything about him at all.   I knew that Mercer and Lane were in partnership.   Father

said : ' Here is a pair of horses from Ann Arbor. Came in this morning between 6 and 7 o'clock. They are to be sold at auction for the high bid.' Mercer and Lane were there, as well as Coombs. Mercer made a bid. The horses were sold separately. Father spoke up, and said : ' Gentlemen, I don't want you to think these horses are Mercer's and Lane's horses, because they are bidding on them. They are not. Where is the man that owns these horses ?' Mr. Coombs stood right at the end of the auction stand. He stepped out, and said, ' Here I am.' There was from 50 to 100 people present in the arena of the building. I saw Mercer and Lane talking with Coombs before any of this property was sold. I saw Lane. I wouldn't be positive about Mercer. I didn't hear the talk between them. Mercer made two or three bids afterwards. When the next horse was brought in, father said, ' Here is one of the pair—mate to the horse just sold—one of the Ann Arbor team.' Later, he said, ' Here is the buggy that goes with the horses.' They were sold one after the other. Mercer bid them all in. I had no reason to know or to believe that anything was wrong about the title to these horses. I didn't know it until three or four days afterwards, when Mercer called our attention to it. This was after Coombs got the money."

It was then conceded by counsel for both parties that a man by the name of Cole, who was absent, would, if present, testify substantially in accordance with the above.

The plaintiff testified :

"There had been a number of bids made, and I made a bid. Mr. Leihy tried to get the bid raised. He seemed to think that the crowd thought the horse might be mine, and that I was booming my own horse, and he said : ' Gentlemen, this is not Mercer's horse. He isn't bidding on his own horse.' He still asked for bids, and no one bid. He looked over the crowd as if looking for somebody, and said, ' Where is the man that brought in this horse, or brought in this team ?' Nobody spoke, and then somebody said, ' Here he is.' Then Leihy says : ' There is the man that brought in these horses. He is the man that owns that team.' I didn't hear the man that was pointed out say anything."

Cross-examination :

"I understood that the man who was represented or claimed to be the owner of the horses was in the crowd.

"*Q.* You had a chance to go over and talk with him if you wanted to, didn't you ?

"*A.* Certainly I had a chance to talk with him. Lane was my partner in the purchase and in the bidding. I bought the horses and Lane bought the buggy. I had some horses there before and at that sale, and knew of the custom of holding the money until 12 o'clock the next day. I did not go over and talk with Coombs. I would not be positive whether Mr. Leihy said, ' Where is the man that owns the team ? ' or, ' Where is the man who brought in this team ?' I am not sure which expression he used. There were several bids made on each horse. The talk in reference to ' Where is the man who owns or brought in the horses ?' was before the first horse was sold, and the buggy was sold after the horses."

Lane testified :

"Mr. Leihy said : ' These horses were fetched in this morning, through the rain. This man came from Ypsilanti with these horses. He had been in three or four different days to have him send up to his farm in Ypsilanti to have this team sent in.' This man stood there in the crowd. I was talking with him, and I said, ' Do you know Mr. Yost, of Ypsilanti ?' He says, ' I do.' Later there was a lull in the bidding, and Leihy said : ' These are not Mr. Mercer's horses. Where is the man that owns these horses ?' His son was driving, and pointed over in the crowd, and says, ' Here is the man.' The man pointed out didn't say a word. Leihy, Jr., pointed him out with his whip."

Cross-examination :

"I was Mercer's partner, and with him in this deal. I talked with the man supposed to be Coombs. I asked him if he knew Yost, of Ypsilanti. He said he did. Yost is a horseman there. After he was pointed out as the owner of the horses, I talked with him the same as I would with anybody in the crowd that would be talking.

"*Q.* Was it after that that you talked with Mr. Coombs ?

"*A.* Certainly, I was talking right along with him. I

couldn't tell you what other talk I had with him. I couldn't tell how long I talked. I couldn't tell whether it was five, ten, or fifteen minutes. I think it was before the horse was struck off to Mercer. The horses were sold before the buggy. I didn't have to walk over where he was. I was standing right by him. * * * . I did not ask him (Coombs) how old the horses were, or how long he had owned them, where he got them, nor whether they were trained to go single or double, nor any other question, that I now recall.

"*Q.* You knew your partner, Mercer, was bidding on these horses?

"*A.* I did not.

"*Q.* Didn't you know he was bidding on them?

"*A.* I did not.

"*Q.* Didn't you notice his bid?

"*A.* No, sir; not until Mr. Leihy said what he did.

"*Q.* Didn't you hear Leihy say so?

"*A.* No, sir; not until Mr. Mercer made the bid that bought the first horse, $52.50.

"*Q.* Didn't you ask a question of Coombs?

"*A.* No, sir.

"*Q.* You had the chance, didn't you?

"*A.* That might all have been.

"*Q.* Didn't you have the chance to find out all about those horses, so far as you knew?

"*A.* Certainly I did not.

"*Q.* But you knew who the man was that was pointed out?

"*A.* I did not, only what they said. I took their word.

"*Q.* You knew the identity of· the individual so that you went over and talked with him?

"*A.* I certainly stood right by this man.

"*Q.* You knew him when Leihy pointed him out?

"*A.* Sure I did. I thought my partner was capable of bidding a fifty-dollar concern without my having to look after it. That is the reason I didn't ask this gentleman. I am quite positive that I had the talk with Coombs right away after Leihy told the crowd that Mercer was bidding on the horses. I think so because I did not know the man before.

"*Q.* Do you want the court to understand that you didn't know, while you were talking with Coombs, and asking him if he knew a man from Ypsilanti, that your partner, Mercer, was bidding on this horse?

"*A.* Not until after Leihy said it.

"*Q.* This was after Leihy said it ?

"*A.* Well, that was about the time I was talking with him."

Wynne testified:

"All I heard Mr. Leihy say is, 'Where is the man that brought those horses in? Where is the man that owns these horses?' I think that is what he said. Then either the man or somebody else said, 'Here he is.' I do not know who said 'Here he is.' It was somebody in the crowd. I couldn't say whether it was Mr. Leihy's son or not. The man who said 'Here he is' was on the opposite side of the team to me. I couldn't see him from where I stood. I stood right to the front on the High street side of the auctioneer's block. Mercer stood right by me. The horses were faced toward High street."

Cross-examination:

"Whoever the man was that said 'Here he is' was standing on the opposite side of the wagon to me. I don't know whether the man said 'Here I am,' or 'Here he is.' The point I want to make is that somebody made that man known by saying 'Here I am,' or 'Here he is.'"

There was testimony that Lane, plaintiff's copartner, talked with Coombs before the sale. This is the substance of the proof upon that subject. Plaintiff claims that it did not warrant a judgment for defendant.

The rule is well established that an auctioneer who does not disclose his principal is presumed to contract upon his own behalf, except where he expressly contracts upon the understanding that he will not do so. On the other hand, if he discloses the fact of agency and his principal, the law presumes that he does not contract upon his own behalf, but for the principal. The question here seems to be whether anything less than a disclosure of the name of the principal is sufficient, and a number of authorities are cited which use language to the effect that a disclosure of the name of the principal is essential. Many of these are cases where there is nothing to indicate that there was an agency; others that the principal was not present,

and no clue to his identity could be found in the facts stated; while there are others which show that there was an absent principal, yet the language used makes such indefinite reference to him as not to afford an opportunity to immediately ascertain who he is. Such is the case of *Neely* v. *State*, 60 Ark. 66 (27 L. R. A. 503), where a minor bought intoxicating liquor, which he said was for two teachers at a neighboring college, without naming or otherwise identifying them. *Raymond* v. *Proprietors of Crown & Eagle Mills*, 2 Metc. (Mass.) 319, is another case where the court held that it was not error to submit the question of the sufficiency of the disclosure to the jury, where an agent stated that goods which he was buying were for the C. & E. Mills, the language being ambiguous. So in *Cobb* v. *Knapp*, 71 N. Y. 350, the statement that the property was for the Blissville Distillery was held not conclusive. In each of these cases except the first there is an implication that the facts shown might be found sufficient, otherwise they should not have gone to the jury. They were not so strong in favor of the agent as the case before us, because the opportunity to ascertain was not immediately present; and in the case last mentioned there was testimony not only that the plaintiff did not know who were the proprietors of the distillery, but that the defendant directed the property to be charged to him.

In *Hanson* v. *Roberdeau*, Peake, N. P. 120, it is indicated, as it is in many later authorities, that, where the auctioneer fully discloses the fact of his agency and his principal, the presumption arises that he is not contracting upon his own behalf, and that the law recognizes the transaction as one on behalf of the principal.

In 2 Kent, Com. 630, 631, it is said:

"If a person would excuse himself from responsibility on the ground of agency, he must show that he disclosed his principal (not the name of his principal) at the time of making the contract, and that he acted on his behalf."

Other authorities quoted from text-writers and other

sources are found in *Neely* v. *State*, 60 Ark. 66 (27 L. R. A. 503). See, also, Reinhard on Agency, § 303.

We are of the opinion that the statement, frequently found, that the agent, to avoid personal liability, must disclose the *name* of his principal, is due to the fact that such is, in the nature of things, the natural and ordinary, and many times the only convenient and practicable, way of identifying him. The important information to be given to the purchaser is that the auctioneer is an agent, acting for a principal whom he *discloses*, and it would seem that the accurate giving of his principal's name is not indispensable where other means of clearly pointing out and identifying him are adopted.

The testimony in this case indisputably shows that the principal was present, and in the presence of the plaintiff identified himself to a degree sufficient to carry that question to a jury, or to the court, where, as in this case, a jury has been waived. It is equally certain that the auctioneer disclosed the fact of agency, and it is inferable that he designed to and did inform those present that he was not selling the property as his own, but for and on behalf of a man who came from Ypsilanti, was present, and upon whom he called to appear and make himself known. We are of the opinion that the court did not err in treating the question as one of fact, subject to decision by him. Of course, we cannot review his finding upon the merits.

The judgment is affirmed.

CARPENTER, BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.