GESSLER et al. v. WINTON.—145 S. W. (2d) 789.

Middle Section. June 15, 1940.

Petition for Certiorari Denied by Supreme Court, December 14, 1940.

412

Haynes & Green, of Winchester, for plaintiff in error.

McLane & Taylor, of Nashville, Dave Robinson, of Smithville, and Lynch, Lynch & Lynch, of Winchester, for defendant in error.

FELTS, J.  J. H. Gessler and C. H. Riddle, partners, sued Hense Winton for breach of warranty of title to six mules bought by them from him at a public auction. His defense was that he made no warranty in fact and none could be implied in law because he sold the mules not as owner but merely as auctioneer for a disclosed third party. The trial judge, hearing the case without a jury, sustained this defense and dismissed the suit. Plaintiffs appealed in error and insist that defendant bound himself personally upon an implied warranty because he sold the mules as the owner or at least as agent for an undisclosed principal and because he contracted in his own name and not as agent.

Defendant was a dealer in livestock, having a sale barn at Decherd, Tennessee, where he regularly sold at public auction cattle, horses and mules. At these sales he would sell his own livestock and also that of other persons which had been sent to him to be sold by him for them on commission. On March 17, 1938, he had a sale, and plaintiffs bought twenty-two mules and two mares and paid defendant therefor by check, and he delivered the stock to plaintiffs.

Six of these mules were later taken by a superior title. Andy Smithson had sold these mules to Rube Love by a conditional sale contract, retaining the title to secure the purchase price; and Rube Love's brother, A. L. Love, had carried these mules to defendant's

414

auction, where, as stated, they were sold to plaintiffs. After plaintiffs had sold them to other persons they were taken from such persons in an action of replevin by Andy Smithson. Plaintiffs notified defendant of this and drew on him for $1,035, the price they had paid him for these particular mules. He declined to pay the draft, advising plaintiffs by letter that the mules had been sold to them by "Mr. Love" and that he had been advised Smithson would not be able to establish title to the mules. In the action for replevin there was a final judgment for Smithson; and plaintiffs had to reimburse their vendees for the value of the mules.

There was a conflict in the evidence as to the disclosures by defendant at the sale of these mules to plaintiffs. Gessler (Riddle was not present) testified that when the mules were offered for sale defendant said, "Here are some mules from Buffalo Valley," and called some one's name, and said "he can tell you about the mules;" that some one did state that they were good work mules; but that he bought them, thinking they belonged to defendant. Defendant testified that he announced that "these mules belong to Love Brothers from Buffalo Valley," and asked Love to tell the crowd about the mules; and that A. L. Love stated that they were sound and well broken to work. Several other witnesses for defendant said that he announced that the mules were "Love's mules." A. L. Love, witness for defendant, testified that defendant announced that the mules "belonged to Love" and that he then told the crowd how good the mules were; but that he did not represent that they were his mules. Rube Love was not present. A. L. Love did not disclose that Smithson held title to the mules under the conditional sale to Rube Love.

As soon as the bidding was over defendant gave Gessler a bill of sale, for all his purchases, including the six mules in question, which was as follows:

"Decherd, Tenn., March 17, 1938
"Sold to J. H. Gessler
"Hense Winton
"Dealer in Mules and Horses
"Auction Sales Every Thursday

"Invoice     No Guarantee Against Sickness or Death     Day 142   Tel. Night 141

"It is expressly agreed that the title to the described livestock is to remain in the said Hense Winton, Decherd, Tenn., until all checks, drafts or notes of same date, if any, are paid in full and on default in payment, he may take possession of same without process of law. It is also expressly understood that any partial payment shall be forfeited as liquidated damages for use of said livestock.

| "Number Head | Tail Number | Hip Number | Mule | Mare | Color | Age | Bought From | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | | 72 | H | | Blue | | Team | $ 122.50 |
| 2 { | | 6 6 | M M | | Blue Bro | | San Antonio " " } | 152.50 |
| 2 { | | 5 5 | M M | | Blue Blue | | San Antonio " " } | 147.50 |
| 2 { | | 11 11 | M M | | Sorrel Blk | | San Antonio " " } | 147.50 |
| 2 { | | 10 10 | M M | | Blue Bro | | San Antonio " " } | 110.00 |
| 2 { | | 92 92 | M M | | Bay Bay | | A. L. Love " " } | 325.00 |
| 2 { | | 94 94 | M M | | Bro Bro | | A. L. Love " " } | 360.00 |
| 2 { | | 93 93 | M M | | Bay Bay | | A. L. Love " " } | 350.00 |
| 2 { | | 54 54 | M M | | Sorrel Sorrel | | J. P. " } | 212.50 |
| 1 | | 60 | M | | Blk | | J. P. | 112.50 |
| 2 { | | 56 56 | M H | | Blk Bro | | J. P. J. P. } | 265.00 |
| 2 { | | 57 57 | M M | | Bro Bro | | J. P. J. P. } | 277.00 |
| 2 { | | 34 34 | | M M | Grey Grey | | Art " } | 270.00 |
| 24 | | | | | | | | $2852.50 |

"Pd by Ck 2/17/38

"O K Out"

Defendant on cross-examination was asked how many of the mules on this bill of sale belonged to him, and admitted that he owned most, if not all, of them except numbers 92, 93, and 94, listed as "Bought from A. L. Love," the six mules in controversy.

He was also cross-examined about the stipulation in the bill of sale by which he retained title to the livestock until "all checks, drafts or notes" given therefor had been paid, and he stated that if plaintiffs' check had not been paid he would have tried to repossess these six mules as well as all the others under this stipulation.

We agree with the learned trial judge that the preponderance of the evidence is that defendant announced he was selling these six mules as an auctioneer for Love Brothers. Gessler admits he was not paying attention to what defendant said, and he evidently failed to understand defendant's announcement. But we think he is nevertheless chargeable with knowledge of what was publicly announced to prospective bidders.

It is true that where one in possession of a chattel sells it as owner the law implies a warranty of title by him. Code, sec. 7206; Rundle v. Capitol Chevrolet, Inc., 23 Tenn. App., 151, 129 S. W. (2d), 217. This is also true where an auctioneer sells personal property without disclosing his agency or his principal. See cases cited in Annotations, 23 A. L. R., 122, 14 B. R. C., 307; Mechem on Agency (2d Ed.), Vol. 2, sec. 2342; 7 C. J. S., Auctions and Auctioneers, sec. 13, p. 1270; 5 Am. Jur., 488. But where he discloses his principal he is not responsible to the buyer for the title unless he makes an agreement himself pledging his own responsibility. Benton v. Campbell, P. & Co. [1925], 2 K. B., 14 B. R. C., 295; Mercer v. Leihy, 139 Mich., 447, 102 N. W., 972. We think this is the meaning of our statute, Code, sec. 7206, which is as follows:

"In a contract to sell or a sale, unless a contrary intention appears, there is

"(1) An implied warranty on the part of the seller that in case of a sale he has a right to sell the goods, and that in case of a contract to sell he will have a right to sell the goods at the time when the property is to pass.

"(2) An implied warranty that the buyer shall have and enjoy quiet possession of the goods as against any lawful claims existing at the time of the sale.

"(3) An implied warranty that the goods shall be free at the time of the sale from any charge or encumbrance in favor of any third person, not declared or known to the buyer before or at the time when the contract or sale is made.

"(4) This section shall not, however, be held to render liable a sheriff, auctioneer, mortgagee, or other person professing to sell by virtue of authority in fact or law goods in which a third person has a legal or equitable interest. (Ib., sec. 13.)"

This statute does not apply where "a contrary intention appears." It would not prevent an auctioneer from becoming personally liable where he contracts in his own name as principal and not as agent.

What is the effect of the bill of sale or invoice given by

defendant to Gessler? It shows the mules were "sold to J. H. Gessler" by "Hense Winton" and "said Hense Winton" retained title to them until the check given for them was paid. That is, defendant sold as principal and not as agent. While the bill of sale described the six mules in question as "Bought from A. L. Love," it similarly described all the others by listing the names of the persons from whom defendant bought them, and it contained nothing to indicate that he was selling any of the mules to Gessler as agent or otherwise than as principal. If this bill of sale may be treated as the contract between Gessler and defendant, it would seem clear that he bound himself as principal and should be held to the same liability as an ordinary vendor.

In Jones v. Littledale, 112 Eng. Reprint, 186, an auctioneer, selling for a known principal but giving the buyer an invoice in the auctioneer's own name, was held liable as principal. The court said:

"There is no doubt that evidence is admissible, on behalf of one of the contracting parties, to show that the other was agent only, though contracting in his own name, and so to fix the real principal; but it is clear that, if the agent contracts in such a form as to make himself personally responsible, he cannot afterwards, whether his principal were or were not known at the time of the contract, relieve himself from that responsibility. In this case there is no contract signed by the sellers, so as to satisfy the Statute of Frauds, until the invoice, by which the defendants represent themselves to be the sellers; and we think that they are conclusively bound by that representation. Their object in so representing was, as appeared by the evidence of custom, to secure the passing of the money through their hands, and to prevent its being paid to their principals; but in so doing they have made themselves responsible; and we think it impossible to read the invoice in the sense proposed."

In Mills v. Hunt, 20 Wend., N. Y., 431, Hunt purchased goods of Mills Brothers & Co., a broker acting for a principal, and received from the brokers an invoice "headed 'L. J. Hunt, bought of Mills, Brothers & Co.,'" followed by a list of the goods. The principal delivered part of the goods but failed to deliver the balance. The brokers were held personally liable for the undelivered portion of the goods, although the invoice or bill of sale was not sufficient as a written contract of sale under the Statute of Frauds, the part delivery being held sufficient to take the case out of the statute. In this case the court said:

"At this day the law must be considered as settled, that a vendor or purchaser dealing in his own name, without disclosing the name of his principal, is personally bound by his contract; and it makes no difference that he is known to the other party to be an auctioneer, or broker, who is usually employed in selling property as the agent for others. Even where he discloses the name of his principal, if he signs a written contract in his own name merely, which contract does

not upon its face show that he was acting as the agent of another, or in an official capacity in behalf of the government, he will be personally bound thereby.''

In Schell v. Stephens et al., 50 Mo., 375, auctioneers sold horses, wagon and harness for a disclosed principal, which turned out to be stolen and were reclaimed from the buyer by the true owners. The auctioneers gave the buyer a receipt signed by both the principal and the auctioneers, as follows:

"Kansas City, June 23, 1868.

"Received of J. W. Schell three ($300) hundred dollars for one bay and one gray horse and one two-horse wagon and harness.

"A. R. Ledford.

"Stephens & Sons.''

It was held that the auctioneers by thus giving a receipt in their own name, which was treated as evidence of the contract, bound themselves personally and were liable for a breach of implied warranty of title. In this case the court said:

"But when a sale by an agent is made, and the purchaser, who is deeply interested in the title and is willing to trust the agent, while the principal is a stranger, takes written evidence of the sale, signed by the agents as principals, they must be held to have assumed the responsibility of principals; and nonetheless so because their business implies agency. Persons who hold themselves out as vendors of the property of others should see to the title of their principals. They have better opportunities of knowing it than purchasers ordinarily have, and though they may not be responsible for title if the property is purchased alone on the credit of the principal, yet it would be natural to rely upon the agent; and if he give a bill of sale in his own name, it must be presumed that the purchaser did so rely.''

See Meyer v. Redmond, 205 N. Y., 478, 98 N. E., 906, 41 L. R. A. (N. S.), 675. See, also, Annotations, 23 A. L. R., 124; 14 B. R. C., 310. In 5 Am. Jur., sec. 59, p. 489, it is said:

"An auctioneer who signs a written contract in his own name merely, which contract does not upon its face show that he was acting as the agent of another, will be personally bound thereby, even though he at the same time discloses the name of his principal, and regardless of whether or not the principal is in fact known. Similarly, when auctioneers on a sale give a bill of sale signed jointly by the owner and themselves, they are liable to the buyer as principals if the title proves bad.''

In the present case the original of the bill of sale is sent up as part of the record. It was a printed form regularly used by defendant at his auction sales. The date, "March 17, 1938,'' and the name "J. H. Gessler'' were written in with pencil; and all the matter as to the description of the mules and the price, and the notations "Pd by ck 3/17/38'' and "O K Out'' were likewise writ-

ten in pencil by defendant's bookkeeper. And defendant admits that he gave this to Gessler as the memorandum of the sale by which they settled and closed the transaction.

■ The learned trial judge seems to have been of the opinion that the bill of sale could not be treated as a written contract fixing the rights of the parties because it was not signed. He said: "This memorandum of sale is not signed by anybody. I cannot see that this memorandum would make the situation different. It is ambiguous and at most could only be a circumstance to be looked to as to what occurred at the time of the sale." We cannot assent to this. If the memorandum may be treated as evidencing the contract, it is not ambiguous. It contains an itemized list of the property sold, the prices of each item, and the names of the seller and the buyer, and it shows that defendant sold this property as principal and not as agent, there being nothing whatever in the memorandum to indicate that defendant was acting otherwise than as principal.

■ The question is not whether the memorandum is sufficient to comply with the Statute of Frauds. The delivery of the property to Gessler and his payment therefor satisfied the statute. Code, sec. 7197; Ashley & Gibbs v. Preston, 162 Tenn., 540, 39 S. W. (2d), 279. The question is whether the defendant adopted and used his printed name as his signature with the intention that it should authenticate the writing as the contract between the parties, when it was delivered to and accepted by Gessler. If so, it must be treated as the contract of the parties, notwithstanding that it was not formally subscribed by defendant. It has often been held that the printed name of the seller on a bill of sale, if adopted by him as his signature, is a sufficient signing of the memorandum to comply with the Statute of Frauds. In Mills v. Hunt, 20 Wend., N. Y., 431, the bill of sale does not appear to have been signed. It was headed "J. L. Hunt, bought of Mills, Brothers & Co.," followed by a list of the goods. This was held not only sufficient to evidence the contract, but also to comply with the Statute of Frauds.

In Drury v. Young, 58 Md., 546, 42 Am. Rep., 343, the memorandum of the sale was:

"Office of Drury, Ijams & Rankin,
"Wholesale and Retail Grocers, and Dealers in Flour, Feed and
    Fertilizers, cor. Gay and High streets.
E. T. Drury,
W. H. Ijams, Jr.,
S. M. Rankin, Jr.

Baltimore, Aug. 27th, 1881.
"Sold to W. H. H. Young & Co., 2,500 cans, say 5,000 doz. C. C. C.
    tomatoes, @ $1.10 p'r doz. cash; cars at Phila. Depot, Balto., Md.
    5,000 dozen, @ $1.10 c.............................$5,500.00."

All of the words above the word "Baltimore" were printed and were the letterhead of the brokers. This was held a sufficient sign-

ing to make the invoice a contract between the buyer and seller. In this case the court observed that the place of the signature in the memorandum was immaterial and that it might be printed as well as written if the printed name was adopted by the party to be charged. In this case the court said:

"It is therefore a sufficient signing, if the name be in print, and in any part of the instrument, provided that the name is recognized and appropriated by the party to be his. The note or memorandum in this case upon its face, contains all the necessary terms of a complete bargain.

"The names of the vendors and purchasers, the quantity and quality of the goods contracted for, the price at which they were sold, and the terms of sale, and the place of delivery, are all clearly expressed therein, and make a sufficiently good memorandum required by the Statute."

In Pearlberg v. Levisohn, 112 Misc., 95, 182 N. Y. S., 615, 617, the memorandum was not subscribed by the signature of the sellers; but the printed firm name appeared at the top and was followed by a description of the goods sold and the prices and the name of the purchaser. This was held sufficient to comply with the Statute of Frauds. The court said:

"The memorandum does not contain any signature of the defendants, either in ink or pencil; but the printed firm name appears at the top of it, and it is contended by defendants that this is not a signing within the meaning of the statute. The statute does not specify any particular form of signing. It merely requires that the party to be charged shall have signed the memorandum. It has been held that a cross mark is a good signature (Zacharie v. Franklin, 12 Pet., 151, 161, 162, 9 L. Ed., 1035); also initials (Barry v. Coombe, 1 Pet., 640, 7 L. Ed., 295; Salmon Falls Mfg. Co. v. Goddard, 14 How., 446, 14 L. Ed., 493); even numerals, when used with the intention of constituting a signature (Brown v. Butchers' & Drovers' Bank, 6 Hill [N. Y.], 443, 41 Am. Dec., 755); and a typewritten name or imprint made by a rubber stamp has the same effect (Landeker v. Co-operative Bldg. Bank, 71 Misc., 517, 130 N. Y. S., 780; Degginger v. Martin, 48 Wash., 1, 4, 92 P., 674); and this is equally true, though the typewriting or stamp impression be made by another, if the person to be charged has directed it (Deep River National Bank's Appeal, 73 Conn., 341, 346, 47 A., 675).

"These and similar cases establish the rule that any name or symbol used by a party with the intention of constituting it his signature, or which is adopted by the party as his signature, is sufficient; and from this it necessarily follows that the party's name printed on the memorandum fully satisfies the statute, if it is shown to have been adopted by him as his signature. This has been the law in England for more than a century, and has been followed quite generally in this country. Saunderson v. Jackson,

3 Esp., 180; Schneider v. Norris, 2 M. & S., 286; Evans v. Hoare, 1 Q. B., 593, 596; Hucklesby v. Hook, 82 I. T. N. S., 117; Cohen v. Wolgel, 107 Misc., 505, 176 N. Y. S., 764; Drury v. Young, 58 Md., 546, 553, 554, 42 Am. Rep., 343. See other cases in note, 37 L. R. A. (N. S.), 352. It has even been held that the name of a party printed on the loose cover of his order book is sufficient. Jones Brothers v. Joyner, 82 L. T. N. S., 768.''

In Williston on Contracts, Rev. Ed., Vol. 2, pp. 1684, 1685, it is said:

''The signature may be in an abbreviated form, as by the use of initials, or the first name only; and it may be by mark, or any code sign arbitrarily adopted by the writer. The signature may be made in pencil, by rubber stamp, or by typewriter; or a printed signature already on the paper may be adopted. There seems no reason to doubt the sufficiency of a description of the party to be charged if it is written with intent to attest or verify the writing.''

Restatements of Contracts, Vol. I, sec. 210, says:

''The signature to a memorandum under the Statute may be written or printed and need not be subscribed at the foot of the memorandum, but must be made or adopted with the declared or apparent intent of authenticating the memorandum as that of the signer.''

It has been held by our Supreme Court that even a deed conveying real estate need not be subscribed by the grantor but is sufficient if his name appears in the body of the instrument and it was delivered by him to the grantee with the intention that it should have effect as a deed. Saunders v. Hackney, 10 Lea, 194, 78 Tenn., 194.

Thus, under the foregoing authorities, defendant's adoption of his printed name as his signature authenticating the bill of sale made it sufficient to comply with the Statute of Frauds. It would certainly seem sufficient as a written memorandum of a less formal contract.

The question whether the party to be charged has signed the memorandum or adopted his name already appearing in it as his signature with the intention of authenticating the writing and thus making it evidence the contract, is a question of fact to be determined from the memorandum and all the circumstances. Of course there are cases where it appeared that the memorandum was incomplete, or was not in fact intended to be authenticated as the contract, such as Burton v. Jones, 147 Tenn., 624, 250 S. W., 548, 28 A. L. R., 1111; Lee v. Vaughan's Seed Store, 101 Ark., 68, 141 S. W., 496, 37 L. R. A. (N. S.), 352; and Campbell v. Henley, 172 Tenn., 135, 110 S. W. (2d), 329. But we think there is no room for doubt that defendant intended to adopt his printed name as his signature and intended thereby to authenticate the bill of sale as the contract between him and Gessler, when it was delivered to and accepted by Gessler.

This being so, defendant is liable as an ordinary vendor

upon an implied warranty of title. This warranty was breached by reason of the outstanding superior title held by Smithson, and plaintiffs had to reimburse their vendees for the value of the mules taken by Smithson. Under the circumstances here appearing, we think the measure of damages for such breach is the price plaintiffs paid for the mules, together with interest thereon. Crittenden v. Posey, 38 Tenn. (1 Head), 311, 312, 316; Brown v. Woods, 43 Tenn. (3 Cold.), 182; 2 Williston on Sales (2 Ed.), sec. 615a, p. 1550; 55 C. J., 890.

The judgment of the Circuit Court is reversed, and a judgment will be entered in this court in favor of plaintiffs and against defendant for $1,035, the price they paid him for the mules in question, with interest from March 17, 1938, the date of the purchase, together with all the costs of the cause, including the cost of this appeal in error.

Crownover, J., concurs; Faw, P. J., did not participate.