**C. M. PASLEY, Plaintiff and Respondent,**

v.

**Harry ROPP, Defendant and Appellant.**

No. 23096.

Kansas City Court of Appeals.

Missouri.

April 4, 1960.

Poague & Brock (Barkley M. Brock), Clinton, for appellant.

John M. Belisle, Osceola, for respondent.

HUNTER, Presiding Judge.

This is a suit by C. M. Pasley, plaintiff-respondent, against Harry Ropp, defendant-appellant, for $1,213.62 on account for cattle sold at Pasley's livestock auction barn. The case was tried to the court which entered judgment for plaintiff for the named amount and this appeal followed.

The salient facts are undisputed. For many years C. M. Pasley operated a public sale barn at Osceola, Missouri, the principal business being the sale of livestock brought to the barn each Thursday. The usual procedure was for the seller to take the livestock to the sale barn where they were placed in pens and given numbers for

identification purposes. A slip was made out by Pasley's employee showing the number of cattle, the seller, and the pen number. The seller was given one copy when the cattle were checked in. When the cattle were paid for the sales barn employee marked one copy paid and the buyer had to have that copy to get his cattle.

The sellers bring their cattle to the sale barn in the morning. The sale begins after the noon hour and may continue until late evening. By established practice, any time after the seller's cattle have gone through the sales ring and are sold he can get the purchase price, less the sales barn commission and handling charges, from Pasley or his employee. The buyer also may pay then or at any later time that day before he leaves the sales barn. He may engage in a number of purchases and sales and elect to wait until the day's end to settle up for all of them.

While the majority of sales are made through the ring by the auctioneer, it is not uncommon for a buyer to buy cattle from the seller while they are still in the pens and before the auction sale begins. There are signs posted that in such event Pasley is to receive his regular commission and handling charges just as though the cattle had gone through the sales ring, and this was known to those who did business there, including Ropp.

If a person buys cattle from the seller while they are in the pens and before the auction sale begins it is required that both the buyer and seller appear before Pasley or his employee and state that such a sale has been made and the sales price they agreed upon. As Pasley testified, they can't get their money until their stock sells "(and) is reported to the office as sold. They either come over there with a man and say 'I bought these cattle' * * * and put it on the sheet there, and the man can get his money as quick as his stock is sold, whether he sells it privately or whether he sells it at public auction." Thus, whether the sale is through the ring or private the seller can obtain the sales price less the commission and handling charges then if the seller requests it, while the buyer may pay then or later that day. Pasley was asked, "suppose * * * you have paid the seller and the buyer don't take them up * * * ?" He answered that if it was too late to stop his check he would keep the cattle.

On the Thursday morning in question, one Bridges brought 8 head of cattle which were placed in pens in the sales barn. There Mr. Mooney acting on behalf of Ropp saw the cattle and Bridges, and undertook to buy them from Bridges. He and Bridges agreed to their sale at 17½¢ per pound. The sales barn did not have scales so they and Ropp loaded up the cattle and took them into Osceola and weighed them, and returned them to the sale barn pens. The agreed purchase price was $1,213.62.

They reported the sale to Pasley's bookkeeper, and upon Bridges' request the bookkeeper issued a check to Bridges for the reported sales amount less the customary commission and handling charge. Bridges took the check to a local bank and after being identified by telephone by the bookkeeper as the one to whom the check was issued, cashed it and disappeared.

The ring sales that day were over about 7:00 p. m. and Ropp, as was customary, went to Pasley's office, settled up for his day's activities, including giving to Pasley a check containing among other items, the amount of the purchase price for the cattle in question. Ropp then placed the cattle in his truck and took them to the stockyards in Kansas City, placed them in pens there with directions they were to be held until the following Monday and then were to be sold. On Monday Ropp returned to Kansas City where he was informed the cattle were stolen and did not ever belong to Bridges. Later their true owners came and took them.

Ropp immediately stopped payment on his check to Pasley and contends he owes

Pasley nothing as Pasley should bear the loss resulting from the sale of the stolen cattle. Pasley had never met Bridges and had no knowledge of the sale arranged by Bridges and Mooney until some time after it had been made. Nor did he or his employees know the cattle had been stolen. He contends the loss in question should be borne by Ropp.

This is a case of first impression in this state, and we have neither been referred to nor have we located any case elsewhere just like it.

There are numerous decisions concerning the right of the true owner of stolen cattle to recover them wherever he finds them, or to successfully sue the seller of them, whether he be an individual, an auctioneer or the operator of a public sales barn, for their conversion.[1] However, these cases do not discuss the rights and obligations existing between the operator of a public sales barn and the purchaser of stolen cattle, located on the sale barn premises, who has been sued by the sale barn owner who has paid the seller for the stolen cattle.

Appellant contends respondent was the agent for the seller and thereby stood in no better position than the seller who sold the stolen cattle to appellant. Assuming, without deciding, that the facts before us are such as to make respondent the agent of the seller, we proceed to examine this contention of appellant.

It is true that broadly stated an auctioneer, in selling property for another, is the agent of the seller, and his rights and liabilities, in the absence of an applicable statute changing them, are governed by the general principles of the law of agency.

It is a settled principle of the law of agency, as of contracts, that where the agent has disclosed his principal, the principal is considered to be the vendor himself, and, as such, responsible to the vendee for title. The agent, in the absence of other facts that may make him liable, is not responsible for the principal's failure to have good title.

In 2 Williston On Sales (Rev.Ed.) Section 296, page 202, it is expressed: "When a contract has been completed the auctioneer is personally liable upon it, unless prior to its formation he disclosed the principal for whom he was acting. * * * if the principal is disclosed, he is the only person who has a contractual relation with a bidder. These results are in accordance with the general principles of law governing undisclosed principals.

In 7 C.J.S. Auctions and Auctioneers § 13, p. 1270, the rule is stated, "An auctioneer is personally responsible as vendor, unless at the time of the sale he discloses the name of his principal, since his general employment as auctioneer is not per se notice that he acts as agent."

In 5 Am.Jur., Auctions, Section 57, page 488, the rule is expressed: "Accordingly, an auctioneer selling for a known principal is not responsible to the buyer for the title, in the absence of his own affirmative agreement, for an auctioneer does not impliedly warrant the title of his vendor."

Thus, if an auctioneer acts for a disclosed principal, the principles of that relationship apply, and unless the auctioneer says or does something to make himself responsible to the buyer, he is not liable to the buyer for title. See, Annotation, Liability of auctioneer or clerk of auction to

1. 7 C.J.S. Auctions and Auctioneers § 13c, p. 1270; 5 Am.Jur., Auctions, Sec. 60, page 489; Annotation, 20 A.L.R. Sec. 8, pages 132 ff.; Allen C. Driver, Inc. v. Mills, 199 Md. 420, 86 A.2d 724; Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W. 2d 39, 2 A.L.R.2d 1108; Walker v. Caviness, Tex.Civ.App., 256 S.W.2d 880; Eureka Springs Sales Co. v. Ward, 226 Ark. 424, 290 S.W.2d 434; Stanley v. Eureka Springs Sales Co., 223 Ark. 877, 269 S.W.2d 319. Cf. Cresswell v. Leftridge, Mo.App., 194 S.W.2d 48; Blackwell v. Laird, 236 Mo.App. 1217, 163 S.W.2d 91; 2 Williston On Contracts (3rd Ed.), Sec. 281, page 307.

buyer in respect of title, condition or quality of property sold, 23 A.L.R. 122; Farmers & Merchants State Bank of Tracy v. Folmer, 217 Minn. 513, 15 N.W.2d 13; Gessler v. Winton, 24 Tenn.App. 411, 145 S.W.2d 789; Oliver v. Eureka Springs Sales Co., 222 Ark. 94, 257 S.W.2d 367.

Several cases are of particular interest. In Corn Land Farms Co. v. Barcus, 105 Neb. 869, 182 N.W. 487, 489, 23 A.L.R. 119, plaintiff sued the clerk of the auction for the purchase price paid for a span of stolen mules sold at public auction which plaintiff innocently earlier attempted to privately purchase from the purported owner who had stolen them. The court in denying recovery quoted with approval from Mercer v. Leihy, 139 Mich. 447, 102 N.W. 972, " 'Where an auctioneer discloses the fact of agency and his principal, the law presumes that he does not contract upon his own behalf but for the principal.' In the instant case, while the auctioneer did not announce for whom the property was being sold, it was immaterial, as the plaintiff's agent knew, as a matter of fact, as heretofore stated, who was the pretended owner, and, as far as any declaration of the ownership was concerned, it was unnecessary as to him."

In Fox v. Wilson, 36 Tenn.App. 324, 255 S.W.2d 416, the sales barn operator sued the seller and the buyers of a cow which died in the barn after being returned by the buyers as sick and after the buyers had paid the seller his part of the sales price and the buyers had stopped payment on their check. The Tennessee court ruled that the sales barn operator was entitled to look to either or both the buyers and the seller for his money. See, also, 7 C.J.S. Auctions and Auctioneers § 13(2), p. 1270.

In Schell v. Stephens, 50 Mo. 375, defendants were auctioneers in Kansas City who sold a span of horses and a wagon which were bid in by plaintiff. The property turned out to be stolen and was reclaimed. Suit was brought on warranty of title by the auctioneers. There the court stated, at page 379: "The mere fact that defendants were acting as auctioneers is not of itself notice that they were not selling their own goods, and they must be deemed to have been vendors, and responsible as such for title, unless they disclosed at the time the name of the principal."

■ Thus, while we have no case exactly in point, the applicable principle of law is not new and is well established. Appellant knew who the pretended owner was and made his purchase by negotiating with him directly. Respondent did not have anything to do with the agreement they reached. But even if we would say he did, the situation at most would be that of an auctioneer who had fully disclosed his principal to the buyer, and who, as such agent, had done nothing to make himself personally responsible for the failure of the principal to have been the owner of the cattle.

Appellant did avail himself of some of respondent's sale barn services. He knew when he reported the sale he and the pretended owner of the cattle had arranged that the pretended owner could and might get his portion of the sales price immediately and that before the sales barn closed that day appellant would be expected to pay the sales price to respondent. Under the circumstances he had a duty to pay respondent and he is not relieved therefrom perforce of any of the applicable principles of the law of agency or contracts. We find no merit in appellant's contention to the contrary.

Respondent and appellant have stipulated that during the time in question in this case, respondent's sale barn was duly licensed and operated in compliance with Chapter 277, Sections 277.010 to 277.140, V.A.M.S. These sections are known as the Missouri Livestock Marketing Law and provide for the licensing of those who hold public livestock sales.

Section 277.050 provides, among other things, that the state veterinarian may sus-

pend or revoke the license of a person who buys, receives, etc. " * * * animals that are known to have been stolen." A violation of that section constitutes a misdemeanor under Section 277.140.

Section 277.080 requires the licensee to " * * * promptly pay over to each vendor the sale price of the property less the fair costs and commissions thereon." Section 277.130 provides: "The licensee shall use reasonable care to determine the true ownership and source of any livestock sold or offered for sale and shall keep a record of same."

Appellant has relied on his theory that respondent must bear the loss involved because he is the agent of a seller who did not have title. Appellant has not contended that respondent failed to use reasonable care to determine the true ownership as required by the statute. Accordingly, we do not undertake to discuss or pass on that subject.

Respondent suggests the motion for new trial was too general to preserve anything for appellate review, but we find it sufficient to raise the questions presented and discussed in this opinion. Cf., First National Bank of Kansas City v. Smirnoff, Mo.App., 325 S.W.2d 359.

The judgment of the trial court is affirmed. It is so ordered.

BROADDUS, J., concurs.

CROSS, J., not participating.