CLARENCE BARRETT, appellee, v. TOM RUMELIOTE, d/b/a MASON
CITY AUCTION COMPANY, appellant.

No. 51220.

(Reported in 126 N.W.2d 322)

FEBRUARY 11, 1964.

Leslie L. Boomhower, of Mason City, for appellant.

Conway & Casey, of Osage, and Brown, Dresser, Kinsey & Jolas, of Mason City, for appellee.

LARSON, J.—The principal question in this appeal is whether a fact issue is presented as to liability of an agent, who unknowingly sold diseased pigs at a public auction, for breach of implied warranty to a buyer who, prior to the sale, visited the pigpen where a small scale ticket containing the owner's name was attached. The trial court, sitting without a jury, found defendant did not carry his burden to prove notice to or knowledge of the buyer sufficient to relieve the agent of seller of liability, and entered judgment against him for the loss, the amount thereof not being in dispute.

Appellant assigns as error the findings of fact and conclusions of law of the trial court holding him liable for implied warranty as being contrary to the weight of the evidence and the law. He contends appellee, under the evidence, had both notice and knowledge of the agency and of the names of the principals involved sufficient to relieve him, as agent, of personal liability. Thus, close and careful consideration of the evidence itself is required. Other minor contentions will be considered in our discussion of this problem.

The record discloses defendant had owned and operated the Mason City Auction Company for several years, and conducted weekly sales of livestock at his sales barn near Mason City, Iowa. Inside the barn were a sales arena, a restaurant, an office, and many various-sized pens. Operational procedure revealed that on the day of the sale farmers brought in their animals and unloaded them at one of two unloading docks. There an employee of the sales barn took the owner's name, obtained information as to vaccination, etc., counted the animals and directed

them to a suitable pen to await the sale that evening. This information was placed on a 6″ by 1¾″ scale ticket or slip (later more fully described) made out in triplicate, which was attached to the pen door by a container or mousetrap. Prospective purchasers usually came down these alleyways before the auction sale started to personally examine the animals at close range. When they did so, it appears obvious they could also examine the scale ticket on the gate and thus find out the name of the owner or owners of the stock, and one witness on cross-examination said it was common procedure. There was no other evidence or showing that such was the custom and practice of all buyers before the auction began, or that these tickets were placed on the pens for the purpose of notifying prospective buyers of the stock ownership.

It appears these scale tickets must accompany the stock when it is driven to the sales arena. After the sale the buyer's name is inserted, one copy is returned to the pen with the stock, and the other two are sent to the office where one is kept and the other delivered to the buyer when he pays for the stock. Apparently this was the procedure followed in the matter at hand.

Plaintiff testified that when he arrived at the defendant's sales barn about 8:30 p.m. on June 22, 1959, to purchase some feeder pigs, as was his custom, he "went and looked at the hogs in the different pens to see if there was any I could use." He purchased such pigs to feed out four to six times a year. On this occasion he made up his mind these 22 pigs were the ones he wanted, and when they came to the arena he bid them in. He did not say it was his practice or general custom to look at the scale tickets on the pen gate, but he did testify that he knew "that there is a little mousetrap or holder on each pen with its ticket in it." To the question, "When did you first know who the owner of the pigs was?" he replied, "Well, I might have read it on the gate down there. I paid no attention, it was just a strange name to me. When I got my tickets, I looked down to see who they belonged to and see his name." He further testified he heard no one say "who the owner of the pigs was" either there or at the arena. He said he actually learned the owners' names after the pigs took sick.

■ On the other hand, appellant testified that while on some occasions he does not name the owner when the stock is being sold, on this occasion he did announce who the owners were when these pigs were brought in the sales arena, and said one of the Allens stood up and directed the separation of these pigs into two groups, one of 19 belonging to C. A. Allen, Jr., and one of three belonging to the father. As to that occurrence appellee recalled someone saying the pigs were divided because they were a father and son's hogs, but denied the owners were named or pointed out on that occasion. Obviously, then, there was a clear dispute as to the evidence of such a revelation at that time, and it is not our duty in this appeal to weigh the evidence. Ver Steegh v. Flaugh, 251 Iowa 1011, 103 N.W.2d 718.

These pigs were sold as unvaccinated animals and, as required by state law, had to be vaccinated by the state veterinarian at the barn before they were allowed off the premises. Within three or four days after they were taken to plaintiff's farm they became sick. Veterinarians were called to treat them, but all except one died within three or four weeks. Some question was raised as to their sickness, but qualified veterinarians posted the animals and opined they died of cholera. It also appeared some other hogs vaccinated that evening at the sales barn became ill and some died of cholera, which gave rise to the contention that the source of the sickness was subsequent to the sale. Plaintiff did testify the veterinarian and defendant promised he would be paid his loss after it appeared there was no cholera on the former owners' farm, that there was a chance the serum was at fault, and that some sick hogs were on the premises the night of this sale. Both denied making such a promise, and again we do not weigh the evidence as to whether the seller's implied warranty had been overcome.

■ This action was predicated on a breach of implied warranty only, and the parties agree, as they must, that in this matter the good faith and lack of negligence on the part of the seller are not a defense to an action grounded upon warranty. Reed v. Bunger, 255 Iowa 322, 122 N.W.2d 290. Thus, as appellee contends, if the owners' liability under their implied war-

ranty that such pigs were suitable as feeder pigs, as announced in the arena, was not conclusively rebutted, the defendant, as agent for an undisclosed principal, assumed that obligation.

I. The trial court's findings of fact are binding upon us if supported by substantial evidence. In considering defendant's contention that his motion for a directed verdict should have been sustained, we give plaintiff's evidence the most favorable construction it will reasonably bear, and even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them a jury question is engendered. These applicable propositions are deemed so well established that authorities need not be cited to support them.

II. In sales at public auction the rule of caveat emptor is not applicable, and under the Uniform Sales Act, chapter 554, Code, 1962, where the buyer makes known to the seller the particular purpose for which the stock is required, and the buyer relies on the seller's skill and judgment, there is an implied warranty that the animals are reasonably fit for that purpose. Doden v. Housh, 251 Iowa 1271, 105 N.W.2d 78, and authorities cited; Ver Steegh v. Flaugh, supra, 251 Iowa 1011, 103 N.W.2d 718, and citations.

III. It is the general well established rule that where a factor sells goods avowedly as factor for a disclosed principal and acts within his authority, he incurs no personal liability to the purchaser; but where he sells personal property such as livestock in his own name, without disclosing his principal, he incurs all the liabilities, express or implied, created by the contract of sale, in the same manner as if he were the principal in interest; and the same rule applies where the factor discloses the fact of his agency but does not disclose the name of his principal. 35 C. J. S., Factors, section 56, page 576; 22 Am. Jur., Factors, section 47, page 333; Hagen v. Brzozowski, Tex. Civ. App., 336 S.W.2d 213; Farmers & Merchants State Bank v. Folmer, 217 Minn. 513, 15 N.W.2d 13. In the latter case the court held an auctioneer who sells property without divulging his principal is considered to be the vendor himself, and as such is responsible to the vendee for a breach of war-

ranty as to condition. Also see annotation, 80 A. L. R.2d, Auctioneer—Clerk—Liability, page 1250.

In 3 Am. Jur.2d, Agency, section 320, page 676, it is stated: "In order for an agent to avoid personal liability on a contract negotiated in his principal's behalf, he must disclose not only that he is an agent but also the identity of his principal, regardless of whether the third person might have known that the agent was acting in a representative capacity. *It is not the third person's duty to seek out the identity of the principal; rather, the duty to disclose the identity of the principal is on the agent*" (citing cases and Williston, Contracts, 3d Ed., section 288). (Emphasis supplied.)

In Oliver v. Eureka Springs Sales Co., 222 Ark. 94, 96, 257 S.W.2d 367, 368, failure to fully disclose the principal resulted in a decree of enforcement of a contract against the sales company. It was stated therein: "There is some indication that Oliver might have discovered the identity of the seller by examining the sales company's books, but he was certainly under no duty to do so and therefore cannot be charged with the information an investigation would have disclosed."

IV. The burden to prove the affirmative defense that the principal-agent relationship was fully and completely disclosed to the buyer or was known to him at the time of the sale was upon the defendant. The question, we have said, was essentially one of fact. Reed v. Bunger, supra, 255 Iowa 322, 329, 122 N.W.2d 290, 295, and citations. However, the factual determination must have substantial support in the evidence, and this question is not immune from review on appeal. Alsco Iowa, Inc., v. Jackson, 254 Iowa 837, 839, 118 N.W.2d 565, 567.

V. The crux of this case, as we see it, then is whether there is substantial evidence to support the trial court's factual finding that defendant failed to prove he had given adequate notice of the principal-agent relationship, or that the buyer had sufficient knowledge as to the principal's identity. Appellant's duty here was to make a clear, complete and public disclosure to all prospective buyers of his relationship to the owners and to identify them. If he proves as a matter of fact that he did so, they are chargeable with knowledge of what was so announced.

3 Am. Jur.2d, Agency, section 319, page 676; Alsco Iowa, Inc., v. Jackson, supra.

It is also pointed out in 7 Am. Jur.2d, Auctions and Auctioneers, section 65, page 278, an auctioneer may adequately disclose his principal by mentioning his name at the time of the auction or by pointing him out to the prospective buyer at the time. Mercer v. Leihy, 139 Mich. 447, 102 N.W. 972. The situation is the same where the buyer knows who the principal is. Thus where the auctioneer announced that he was selling as auctioneer for certain designated persons, the buyer was chargeable with knowledge of such announcement even though he was not paying attention to what the auctioneer said and evidently failed to understand the announcement. Gessler v. Winton, 24 Tenn. App. 411, 145 S.W.2d 789; Restatement of the Law, Agency, chapter 1, section 9.

On the other hand, it has been held that even if the auctioneer is required to record the names of the sellers and keep the record open for public inspection, such record would not itself put the purchaser on notice. Hagen v. Brzozowski, supra, Tex. Civ. App., 336 S.W.2d 213. The duty to discover the identity does not rest upon the buyer, even though the effort required is not great. Oliver v. Eureka Springs Sales Co., supra.

No statutory provision is claimed which would require posting of the seller's name on the pens or make such posting constructive notice to buyers. Nor was there any conclusive showing that by custom scale tickets so attached to the pigpens were generally considered or accepted as notice of the owners by the patrons of sale barns. In other words, the trial court determined as a matter of fact that there was no sufficient statutory authority or custom shown by which constructive notice would be imputed to buyers by attaching scale tickets bearing the owner's name to the pen containing the stock to be sold later in the arena. It also found plaintiff had not learned who the owners were from the scale tickets. We are inclined to agree that under this record it cannot be said as a matter of law that the buyer was duly notified or had knowledge as to who the sellers were until after the sale had been completed, but the record seems to bear out appellee's contention that when he bid

on the pigs the bid was made upon the responsibility of defendant and that appellee looked to him for the fulfillment of the implied warranty as to their quality and condition as feeder pigs, not upon the Allens. See Meyer v. Redmond, 205 N. Y. 478, 98 N.E. 906, 41 L. R. A., N. S., 675.

While it may be that, under a satisfactory showing that buyers by custom and practice look to these small scale tickets for information as to ownership of the stock, knowledge of this fact might be imputed to the buyer, and that if a large sign bearing the name of the owner had been placed upon the pen, obviously intended to impart such information to the prospective buyers, it might well be concluded such buyers had knowledge as to identity of the principal, especially if they admitted presence at the pen. Gessler v. Winton, supra. We are satisfied that unless the clear purpose of the publication is to notify, the obligation to prove knowledge therefrom is and should be a heavy one. Here, with the notification purpose of the tickets not so evident or accepted as notice in the trade, the small size of the slips, and no showing that the light on this occasion was adequate, we cannot say as a matter of law that plaintiff under these circumstances had sufficient knowledge of the principal's identity.

While plaintiff admitted he visited the pen upon which these two scale tickets, Exhibits C and D, were attached, he did not state positively that he read them. Darkness had fallen and the writing was by pencil and small. These exhibits, only 1¾ inch by 6 inches, are designed to contain the following: the pen number, the number of head, the weight, the date, the price, and the total sale price, the name "Mason City Auction Company" printed, the seller's name, the description, and the name of the buyer written in. It is doubtful they would qualify as a public notice, and we do not think it appears they were so designed. If it was only an internal business record, the buyer was under no obligation or duty to seek the information it bore. Oliver v. Eureka Springs Sales Co., supra; 3 Am. Jur.2d, Agency, section 320.

We must conclude plaintiff's evidence, given the most favorable construction it will reasonably bear, does generate a jury

question on adequate disclosure of the principals herein, and hold the court's verdict is supported by substantial evidence and justifiable inference. The judgment as to damages against appellant must, therefore, be affirmed.—Affirmed.

GARFIELD, C. J., and HAYS, MOORE, PETERSON and THORNTON, JJ., concur.

THOMPSON, SNELL and STUART, JJ., dissent.

THOMPSON, J. (dissenting)—There are none so blind as those who will not see. This truism rules the case at bar; but because it is not applied by the majority I am compelled to disagree.

My dissent is not because of any misstatement of the applicable rules of law in the majority opinion. I have no controversy as to the principles stated. But I am convinced the facts have been ignored or misconstrued. The plaintiff's own testimony shows that he had full knowledge, or the known means of knowledge, that the defendant was acting as agent and the names of his principals in the transaction. He testified that he inspected the hogs which he later purchased, when they were in their pens before they were brought into the sales ring. This question and answer appear in the record: "When did you first know who the owner of the pigs was? A. Well, I might have read it on the gate down there. *I paid no attention, it was just a strange name to me.*" (Italics supplied.)

Again, there is this testimony: "Q. Do you remember who told Tommy [the defendant] how to sort these pigs when they was being sold? A. I know they said they had to be sorted in the ring. Q. Who said that? A. No, I don't know. There was some that belonged to Junior, and the bigger bunch—how was that—well, some they had a 'V' or something on them, red mark. I think the bigger bunch belonged to his father. Q. Bigger ones belonged to the father and the others to the son, is that right? A. Yes. Q. So they had to sort them? A. Yes. Didn't see Mr. Allen. Wouldn't know Mr. Allen if I seen him; wouldn't know him from you."

C. M. Allen, who owned some of the hogs which the plain-

tiff purchased, told of the system used for showing the owner-ship: "When they unload them, they make out a ticket and put the pigs in a pen. Q. And on the ticket your name and number of animals that you have? A. That's right. Q. And that is on the pen where you stick it up on a little mousetrap? A. That's right. * * * These pigs were marked separate and my son's were sold separate."

Alfred Nagel, a witness for the plaintiff, testified that he had attended sales at the defendant's sales barn for 6 or 7 years. Further: "Q. When you come to the barn looking for hogs, you go back in the pens to look them over before the sale? A. Yes. Q. And that is the common procedure of all the prospective buyers to go through the pens and look at all the pigs or cattle or sheep or whatever they are selling, isn't that true? A. That's right and also look at the tickets and see where they come from, see whether you know the party that run them in and whether they come from a good home."

As I read the plaintiff's own testimony, he inspected the pigs, saw the tickets with the owners' names plainly printed, but paid no attention because he did not know them. They were just "strange names" to him. He also said that when the hogs were sold the two bunches of Allen hogs were sorted out in the sales ring, because of the different ownerships. "One was the father and one was the son—I didn't pay any attention." Again, as to the sorting: "There was some that belong to Junior [the son's name is C. M. Allen, Jr.], and the bigger bunch * * * I think the bigger bunch belonged to the father."

The testimony of Alfred Nagel as to the custom of inspect-ing the hogs before buying, and looking at the names on the slips attached to the pens to see to whom they belonged, is un-disputed. This was offered by plaintiff's witness.

The rule is thus stated in 3 C. J. S., Agency, section 216, page 125: "An express notice of agency and the identity of the principal is not necessary, however, if the third person may be charged with notice by reason of the attendant circumstances and the facts surrounding the transaction, coupled with the general knowledge that transactions of the agent in that par-ticular line of business are entered into in his character as agent,

not on his own behalf * * *." But it is not necessary to go so far here. The plaintiff admittedly saw the slip with the owners' names on the pens, but paid no attention because they were "strange names" to him. He should not now be heard to say he was not advised that the defendant was acting as agent for principals whose names were made known to the plaintiff but were ignored by him because he has no personal acquaintance with them. There was no room for a finding by the trial court that the agency or the names of the principals were not disclosed to the plaintiff before the sale. The plaintiff's own testimony forecloses that.

I would reverse, with directions to enter judgment for the defendant.

SNELL and STUART, JJ., join in this dissent.