HARRY VER STEEGH, appellee, v. O. K. FLAUGH, appellant.

No. 50015.

(Reported in 103 N.W.2d 718)

June 14, 1960.

Hammer, Matthias & Tyler, of Newton, for appellant.

Bray & McCoy, of Oskaloosa, for appellee.

GARFIELD, J.—Plaintiff Ver Steegh brought this law action against defendant Flaugh to recover damages for claimed breach of warranty of a boar sold by defendant to plaintiff. Following trial to the court without a jury plaintiff had judgment for $1203.62 from which defendant appeals.

The original petition was drawn on the theory of breach of express warranty. It alleged defendant warranted the boar at time of sale to be healthy and capable of use for breeding purposes. At the close of the evidence the court granted plaintiff permission to amend his petition by alleging breach of

implied warranty that the boar was healthy and free from disease. The judgment is based on a finding of breach of such implied warranty. One of the errors defendant assigns, to be considered later, is the grant of permission to so amend plaintiff's petition.

Plaintiff and defendant are farmers living in adjoining counties. Defendant raises purebred Duroc and Hampshire hogs. November 12, 1956, plaintiff purchased from defendant a Hampshire boar for $75. One Loynachan also purchased a boar from defendant at the same time. Plaintiff's boar was taken to his farm and put with another boar for two weeks. He had purchased the other boar four or five months earlier at a sale barn. After the two weeks plaintiff's two boars were turned out with his 59 gilts or young sows for about four weeks. Several of the gilts aborted.

Plaintiff's veterinarian, Dr. L. D. Belknap, drew blood from the Flaugh boar and three of the gilts that aborted and sent it in separate test tubes for analysis to the veterinary diagnostic laboratory at Iowa State University at Ames. The laboratory's report of the analysis was that the boar and one gilt reacted to brucellosis, commonly called Bang's disease, and the other two gilts were suspects. The usual effect of this disease on bred sows is that they abort. The veterinarian witnesses agreed the disease may be transmitted to the sow by an infected boar in the breeding act. One such witness, apparently disinterested, testified it is the most common way of transmitting the disease. He and another veterinarian testified Bang's disease causes sterility in boars and destroys their usefulness for breeding.

When Doctor Belknap received the report of the analysis of the blood from the Flaugh boar and three of plaintiff's gilts he advised plaintiff to dispose of all his gilts because they had been bred to the boar and most of them probably would abort. Plaintiff followed this advice. Another veterinarian testified that when there is Bang's disease in a drove of swine the quickest, safest and most practical course is to dispose of all of them.

Plaintiff testified that when he and Loynachan purchased

the boars defendant said they were good breeders and were clean, "which I interpreted as meaning they were healthy and I had no knowledge to the contrary and relied upon his statement which I believed to be true." Defendant testified he was offering the boars sold plaintiff and Loynachan and five other boars for sale for breeding purposes, supposed plaintiff wanted for such purposes the animal sold him and defendant sold it therefor. He admitted that if the boar had Bang's disease it would not qualify as a breeder.

About December 24, 1956, plaintiff sold his other boar, purchased at the sale barn, to Loynachan. This was after most of plaintiff's gilts were bred but before any of them aborted and before plaintiff knew the Flaugh boar reacted to Bang's disease. Loynachan's 20 gilts were bred to the boar he purchased from defendant on November 12 but they "kept coming back in heat and did not settle." Loynachan sold this (Flaugh) boar as a nonbreeder.

January 15, 1957, Dr. Frank Peak, a veterinarian, drew blood from the sale barn boar and Loynachan's 20 gilts and sent it in separate tubes for analysis to the laboratory at Ames. Report of the analysis was that two of the gilts reacted to Bang's disease, the others and the sale barn boar were negative.

I. Defendant first assigns error in the overruling of his motion to strike as hearsay the evidence of Dr. E. A. Carbray, veterinarian in charge of the laboratory at Ames, as to results of the analyses of the blood taken from plaintiff's and Loynachan's hogs. The motion, made at the end of defendant's cross-examination of the witness on this part of his testimony, stated that the witness did not record the results of the tests on the reports, did not sign them and was not certain he supervised "the placing of that material."

We will consider this assigned error in connection with the second one—admission in evidence of the laboratory reports, Exhibits A to F inclusive, of the analyses of plaintiff's and Loynachan's hogs. Defendant objected to the exhibits as hearsay, not properly identified and there being no proper connection between the exhibits and the animals in question. In addition Exhibits C and E were objected to as incompetent, ir-

relevant and immaterial because they relate to leptospirosis, a separate disease from Bang's although similar to it.

Exhibit F is the only one of these exhibits which refers to plaintiff's hogs—the Flaugh boar and three gilts from which, as stated, Doctor Belknap drew blood on January 7. The other exhibits refer to Loynachan's hogs. His 20 gilts were bred to the boar he purchased from defendant at the same time plaintiff obtained the boar in controversy.

Doctor Belknap testified he drew blood from the boar plaintiff purchased from defendant and from three of plaintiff's gilts, sent it to the laboratory at Ames by parcel post in a well-packed carton designed for this purpose, mailed it himself in the post office at Knoxville with the regular amount of postage on the package, it was identified as having come from him, Exhibit F is in his handwriting and accompanied the blood specimens. The exhibit is on a form evidently prepared and furnished veterinarians by the laboratory at Ames. It gives the veterinarian's and herd owner's names and addresses, tag number and kind of each animal bled, date bled, the number affixed to each tube of blood, the age, sex and breed of each animal. All this information, according to Belknap, was entered on Exhibit F by him. Entries in the columns headed "Test dilutions" and "Test results" as to each animal, together with the total number of nonreactors, reactors and suspects, the date the blood was received at the laboratory (as to Exhibit F, one day after it was mailed), and the name of the veterinarian in charge (Doctor Carbray) were made at the laboratory. There was no objection to any of this evidence of Belknap.

Doctor Peak, another veterinarian, testified in detail that he took samples of blood from Loynachan's hogs, put the samples in separate test tubes properly identified and gave them to his office girl to put in mailing cases and send to the Ames laboratory. He or his office girl made out the exhibits similar to Exhibit F and he received them back from the laboratory with the results of the tests. The office girl testified she or her assistant, under her supervision, checked and packaged the samples for mailing and mailed them to the laboratory.

Doctor Carbray testified: "Exhibits A, B, D and F are charts representing tests performed at my laboratory. Whether I personally saw them I cannot say. They were done under my supervision and I was responsible for them. They are accurate to the best of our ability which we feel is pretty good. Exhibits A, B, D and F came under my supervision. They refer to blood samples submitted to the 'lab' which we tested and recorded the results on these exhibits. The blood samples came to the laboratory with the exhibits." The witness described in detail the method of testing the blood samples and recording the results thereof. His name was signed to the exhibits by one of the technicians. Defendant made no objection to Carbray's testimony.

Dr. Paul Bennett, another veterinarian at the Ames laboratory, testified with reference to Exhibits C and E, reports of tests for leptospirosis on Loynachan's hogs. He said that after blood samples are tested the blood is discarded. Although the general objection to these two exhibits might have been sustained it is not pointed out, nor is it apparent, that they were prejudicial to defendant.

At best it is doubtful that defendant's motion to strike Doctor Carbray's testimony as to results of the tests was timely. As stated, defendant did not object to it as it came in and grounds of the motion should have been apparent before it was made. See in this connection Kuiken v. Garrett, 243 Iowa 785, 804, 51 N.W.2d 149, 160, 41 A. L. R.2d 1397, and citations; State v. Woodmansee, 212 Iowa 596, 613, 614, 233 N.W. 725; State v. Van Tassel, 103 Iowa 6, 13, 72 N.W. 497. See also Lowman v. Kuecker, 246 Iowa 1227, 1230, 1231, 71 N.W.2d 586, 588, 589, 52 A. L. R.2d 1380.

4 C. J. S., Appeal and Error, section 290b(1), page 872, states, "* * * an objection, to be timely, must ordinarily be made at the earliest opportunity after the ground of the objection becomes apparent."

Aside from the above we are not persuaded it was error to overrule defendant's motion to strike as hearsay the testimony of Doctor Carbray or the objection of hearsay to Exhibits A to F. Gearhart v. Des Moines Ry. Co., 237 Iowa 213, 216–220,

21 N.W.2d 569, 571, 572; Ipsen v. Ruess, 239 Iowa 1376, 1383, 1384, 35 N.W.2d 82, 88; Olesen v. Henningsen, 247 Iowa 883, 888-892, 77 N.W.2d 40, 43-45; Farmers Insurance Exchange v. Moores, 247 Iowa 1181, 1192, 1193, 78 N.W.2d 518, 526; Chicago Cosmetic Co. v. City of Chicago, 374 Ill. 384, 392, 29 N.E.2d 495, 499.

Under these and other authorities therein cited it was unnecessary to produce the individuals employed in the laboratory who in the regular course of business made the entries on the exhibits there, or those who actually tested the blood samples, under Doctor Carbray's supervision. It is probable they could be produced only with much difficulty, would have little if any recollection of the transactions and could not add materially to the authenticity of the exhibits.

The Chicago Cosmetic Co. case, supra, holds the head of the city testing laboratory could properly testify to "the result of the analyses made at the laboratory, by him, or under his supervision" of cosmetics containing toxic materials. (Page 392 of 374 Ill., page 499 of 29 N.E.2d)

Our Gearhart decision, supra, holds it is not necessary that all entries on hospital records be verified by the physicians and nurses who make them, provided it is shown by the custodian of the records they are authentic, made in the usual course of business and the manner of making them. This is followed in Ipsen v. Ruess, supra.

Olesen v. Henningsen, supra, approves admission of a telephone ticket to show the time of a call from Graettinger to Emmetsburg although it was impossible to tell what operator handled the call at Emmetsburg and the Graettinger operator did not testify she handled the call there.

The specimens of blood were sufficiently traced as blood from plaintiff's and Loynachan's hogs. The specimens were at all times in the custody of a witness upon the trial, until they reached the laboratory except while in the possession of the postal authorities. The testimony as to packaging and mailing raised a presumption of delivery by these authorities to the laboratory. State v. Weltha, 228 Iowa 519, 524, 292 N.W. 148. And the testimony shows such delivery. That the specimens

which were analyzed were sufficiently identified see State v. Werling, 234 Iowa 1109, 13 N.W.2d 318; State v. Van Tassel, supra, 103 Iowa 6, 18, 19, 72 N.W. 497; Annotation, 21 A. L. R.2d 1216, 1221–1223.

That the blood specimens were discarded, pursuant to the usual practice at the laboratory after they were analyzed, is not a valid ground for excluding the exhibits. State v. Romo, 66 Ariz. 174, 185 P.2d 757.

The record indicates veterinarians accept as reliable reports of analyses similar to these exhibits. It is common knowledge physicians and surgeons accept as reliable laboratory reports of analyses of specimens from the human body. There is no good reason why such reports should not be received in evidence under the showing made here as to their authenticity.

We may observe there is other evidence the boar in question was infected with Bang's disease.

II. On re-cross-examination of plaintiff, defendant sought to show the sale barn boar had Bang's disease. This is part of the record:

"Q. Have you paid Mr. Loynachan damages for selling him an infected boar? A. No, sir. * * *

"Q. Is there an exhibit that shows it tested clean in January 1957? A. You'd have to have Mr. Bray pick that out. I don't know anything about these exhibits about that boar. * * * Mr. Loynachan and Dr. Peak told me the boar I sold Loynachan was tested."

On re-redirect examination plaintiff testified without objection that both Loynachan and Peak told him the sale barn boar was tested in January and was negative. At the end of the second re-cross-examination of plaintiff, defendant moved to strike the testimony as to the statement by Loynachan regarding the cleanness of the sale barn boar as hearsay because not made in defendant's presence. The overruling of the motion is assigned as error.

It is sufficient to say the motion was not timely because not made as soon as grounds therefor were apparent. Nothing in the second re-cross-examination made grounds of the motion

more apparent than when the evidence was received. See authorities first cited herein.

Further, the testimony sought to be stricken added little to that given on re-cross-examination. Also, there remained in the record, without objection or motion to strike, like testimony as to what Doctor Peak told plaintiff. There is other evidence too that the sale barn boar did not react when tested for Bang's disease. Thus the ruling complained of was without substantial prejudice to defendant. Shane v. Russell, 250 Iowa 44, 46, 92 N.W.2d 567, 568, and citations; State v. Mabrey, 245 Iowa 428, 432, 433, 60 N.W.2d 889, 891, 892, and citations; Riley v. Luedloff, 253 Minn. 447, 92 N.W.2d 806, 809; 5A C. J. S., Appeal and Error, sections 1729–1731; 3 Am. Jur., Appeal and Error, section 1028.

III. At the close of plaintiff's evidence defendant moved for a directed verdict or dismissal on the ground there was no evidence the Flaugh boar was not healthy when sold. Apparently without objection from either side the court reserved ruling on the motion. Defendant assigns error in the court's failure to rule. It is clear there is no error here of which defendant may complain. Since the motion was not renewed at the close of all the evidence any error in overruling it, if it had been overruled, would be waived. Olson v. Barnick, 245 Iowa 217, 222, 61 N.W.2d 733, 736, and citations; Commercial Credit Co. v. Hazel, 214 Iowa 213, 215, 242 N.W. 47, and citations; Yaus v. Shawmutt Egg Co., 204 Iowa 426, 430, 213 N.W. 230, and citations.

It is not unusual for a trial court to reserve ruling on a motion for directed verdict at the close of plaintiff's evidence and to give the motion further, more careful consideration if renewed at the close of all the evidence. Indeed we have approved submitting a case to the jury, although the trial court felt a motion to direct verdict was good, and then entering judgment for defendant notwithstanding verdict for plaintiff on the ground urged in the motion to direct. Such procedure may avert appeal or avoid the necessity of a retrial in the event of reversal on appeal and conforms to the spirit of rule 243(b),

Rules of Civil Procedure. Florke v. Peterson, 245 Iowa 1031, 1033, 65 N.W.2d 372, 373.

A further reason for not sustaining this assigned error is that defendant has not argued here that the single ground of his motion to direct was good.

IV. As previously stated, defendant assigns error in permitting plaintiff at the close of the evidence to amend his petition to conform to the proof by alleging breach of implied warranty. Rule 88, Rules of Civil Procedure, provides the trial court, "in furtherance of justice," may allow amendments to any pleading after another pleading has been filed responding to it, "including those to conform to the proof and which do not substantially change the claim or defense." Rule 88 is about the same as section 11182, Code, 1939, which the rule supersedes and should have substantially the same interpretation previously accorded the statute. Terpstra v. Schinkel, 235 Iowa 547, 551, 552, 17 N.W.2d 106, 109; Nelsen Auto Sales v. Turner, 241 Iowa 927, 931, 44 N.W.2d 36, 38; Robinson v. Home F. & M. Ins. Co., 244 Iowa 1084, 1090, 59 N.W.2d 776, 780.

About the same restriction now found in rule 88, that the amendment does not substantially change the claim or defense, has been part of the applicable statute since the Revision of 1860 (section 2977).

The trial court has a broad discretion in the matter of allowing amendments to pleadings, especially those to conform to the proof. We have frequently said that to allow such an amendment is the rule, to deny it is the exception. Webber v. E. K. Larimer Hdwe. Co., 234 Iowa 1381, 1389, 15 N.W.2d 286, 290, and citations; Elson v. Nickles, 240 Iowa 292, 294, 36 N.W.2d 343, 344; Nelsen Auto Sales v. Turner, supra, 241 Iowa 927, 931, 44 N.W.2d 36, 38; Benson v. Chase Grain Storage Co., 246 Iowa 591, 596, 67 N.W.2d 433, 435, 436.

We are not persuaded the allowance of the amendment here was an abuse of discretion. The matters alleged in the amendment were litigated without objection. The claim of implied warranty is largely based on the cross-examination of defendant, received without objection, that he supposed plaintiff was buying the boar for breeding purposes, defendant sold

■■■■■■ ▬▬

it for such purpose, intended plaintiff to understand he was buying a healthy boar and knew that if it had Bang's disease it would not qualify as a breeder. The amendment did conform to the proof. The damages prayed for arose from the same transaction referred to in the petition.

Lowery Co. v. Lamp, 200 Iowa 853, 855, 205 N.W. 538, 540, holds that if a plaintiff "pleads an express contract, and the evidence proves or tends to prove an implied contract, he is privileged to amend, to make his pleading conform to the evidence."

See also in support of our holding Eilers v. Frieling, 211 Iowa 841, 843, 844, 234 N.W. 275; Hardin v. Union Mut. L. Ins. Co., 222 Iowa 1283, 1290, 1291, 271 N.W. 176 (citing Lowery Co. v. Lamp, supra, with approval); Terpstra v. Schinkel, supra, 235 Iowa 547, 551–553, 17 N.W.2d 106, 108, 109; Nelsen Auto Sales v. Turner, supra, 241 Iowa 927, 930, 931, 44 N.W.2d 36, 37, 38; Thorne v. Reiser, 245 Iowa 123, 128, 60 N.W.2d 784, 787; Johnson v. Johnson, 245 Iowa 1216, 1222, 1223, 65 N.W.2d 157, 161.

Defendant did not request opportunity to offer further evidence after the amendment was allowed.

■■ ■■ V. We cannot sustain defendant's claim of error in the trial court's finding that plaintiff's herd was infected with Bang's disease by the boar in question. In this connection we must view the evidence in the light most favorable to plaintiff. Our function is not to weigh the evidence but to decide whether the finding is supported by substantial evidence. Marxen v. Meredith, 246 Iowa 1173, 1177, 69 N.W.2d 399, 401; Morf v. Washburn, 250 Iowa 759, 762, 763, 94 N.W.2d 756, 758, and citations. We think the finding has such support and does not rest merely upon conjecture. There is evidence plaintiff's hogs had no Bang's disease before they were bred to the Flaugh boar and the sale barn boar; also that the former had Bang's disease and the latter did not. After plaintiff's gilts were thus bred some of them aborted. "The usual effect of Bang's disease on bred sows is that they abort", according to Doctor Belknap. He advised selling all the sows because probably most of them would abort. Doctor Carbray testified that while there are a

number of ways Bang's disease can be transmitted to swine the most common is by breeding an infected boar to a sow. And Belknap said that when Bang's disease is introduced in a place where hogs are kept, the premises become infected with the disease. Further reference to the evidence on this point seems unnecessary.

VI. Under his remaining assigned error that is argued defendant says the court erred in determining and applying the law of implied warranty and that there is no such warranty against a disease which could not be discovered by the seller on the date of sale if he used all possible and scientific means. There is no indication the court erred in determining or applying the law of implied warranty.

The applicable law is found in the Uniform Sales Act, chapter 554, Codes 1954, 1958, enacted by the Thirty-eighth General Assembly in 1919. Section 554.16 provides:

"1. Where the buyer * * * makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment * * * there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *.

"6. An express warranty * * * does not negative a warranty * * * implied under this chapter unless inconsistent therewith."

Section 554.77 says, " 'Goods' includes all chattels personal other than things in action and money."

It is not claimed the express warranty alleged in the petition is inconsistent with the implied one alleged in the amendment.

We have held that under the above statute there is an implied warranty a sow purchased for breeding purposes is reasonably suitable therefor although an express warranty was also claimed. Petersen v. Dreher, 196 Iowa 178, 180, 181, 194 N.W. 53, 54. The opinion states "the doctrine of caveat emptor has no application in the instant case."

The statute is also applied and Petersen v. Dreher, supra, is followed in Trousdale v. Burkhardt, 207 Iowa 1133, 224 N.W. 93, in holding there was an implied warranty in the sale of a thoroughbred cow for breeding purposes.

Even before the Uniform Sales Law was enacted Redhead Bros. v. Wyoming Cattle Investment Co., 126 Iowa 410, 418, 102 N.W. 144, 146, held: "Plaintiffs knew that defendant intended these animals for use for breeding purposes * * * and * * * they were bound to select and deliver such only as were then suitable for that use * * *."

 Code section 554.16(1) is also applied in upholding a claim of implied warranty against a grower of seed corn in Drager v. Carlson Hybrid Corn Co., Inc., 244 Iowa 78, 83, 56 N.W.2d 18, 21. After quoting the statute the opinion states: "This * * * contains two vital requirements: (1) That the buyer * * * makes known to the seller the particular purpose for which the goods are required, and (2) it appears the buyer relies on the seller's skill or judgment. See [citations]."

Marxen v. Meredith, supra, 246 Iowa 1173, 1180, 69 N.W.2d 399, 402, 403, upholds a claim of implied warranty under 554.16(1) in the sale of hog spray. See also Brandenburg v. The Samuel Stores, 211 Iowa 1321, 1324, 1325, 235 N.W. 741, 77 A. L. R. 1161; Hughes v. National Equipment Corp., 216 Iowa 1000, 1006, 1007, 250 N.W. 154.

The annotation to Mousel v. Widicker, N. D., 69 N.W.2d 783, 53 A. L. R.2d 884, commencing on page 892, at 899, says: "Where the seller of a chattel knows the purpose for which the buyer desires to purchase it, the general rule is that there is an implied warranty that the chattel is suitable for that purpose. This rule has applied to the sale of animals for breeding purposes, so that the implied warranty is breached if, for any reason attributable to the * * * physical condition of the animal, it did not produce offspring. Such application of the rule presupposes, of course, that there was justifiable reliance on the part of the buyer on the knowledge, skill, or integrity of the seller."

Numerous decisions are cited in support of the quoted statement, including our own Petersen v. Dreher and Trousdale v. Burkhardt, both supra. Mousel v. Widicker, supra, rejects a contention like that made by defendant here in upholding a claim of implied warranty in the sale of a bull. (Pages 786, 787 of 69 N.W.2d) An annotation earlier than that in 53

A. L. R.2d 892, following Moeckel v. Diesenroth, 253 Mich. 284, 235 N.W. 157, 74 A. L. R. 116, commencing page 118, at 119, 120, states the rule there quoted and cites earlier supporting precedents.

Alford v. Kruse, 183 Minn. 158, 235 N.W. 903, holds there was an implied warranty under the Uniform Sales Act in the sale for breeding purposes of registered cows infected with Bang's disease.

In an action for breach of warranty it is not necessary for the buyer to show scienter on the part of the seller or that he knew the warranty was false. Passcuzzi v. Pierce, 208 Iowa 1389, 227 N.W. 409; Rasmus v. A. O. Smith Corp. (N. D. Iowa, Judge Graven), 158 F. Supp. 70, 79. Good faith and lack of negligence are no defense. Prosser on Torts, Second Ed., page 523; Rasmus case, supra.

77 C. J. S., Sales, section 330a(3), page 1189, states: "* * * where any seller sells an animal for breeding purposes, knowing that the purchaser is buying * * * for that purpose, there is an implied warranty of its reasonable fitness therefor, and * * * that it is not affected with a disease which destroys its value for such purposes; * * *."

It is clear there may be an implied warranty of reasonable fitness of an animal notwithstanding the seller's lack of knowledge that it does not comply with the warranty and notwithstanding the difficulty of discovering this fact. However, we do not agree this defendant could not have discovered the boar was infected with Bang's disease when he sold it for breeding purposes. Some of defendant's hogs had Bang's disease earlier in 1956. Seven of 12 tested therefor were either suspects or reactors. The evidence is in conflict as to whether they were kept on the same farm as the boar or on another farm owned by defendant. In January 1957 defendant admitted he had had Bang's disease in his herd, according to plaintiff.

Defendant has cited some older decisions, not governed by the Uniform Sales Act, which apply the rule of caveat emptor. They are not applicable to a case like this governed by the Uniform Act.

 VII. Other assigned errors are not argued and are therefore deemed waived. Rule 344(a)(4)(Third), Rules of Civil Procedure; Waterloo Savings Bank v. Waterloo, C. F. & N. R., 244 Iowa 1364, 1376, 1377, 60 N.W.2d 572, 579, and citations; In re Estate of Kneebs, 246 Iowa 1053, 1056, 70 N.W.2d 539, 541. However, we will say we find no reversible error in those assigned but not argued.—Affirmed.

All JUSTICES concur except OLIVER, J., not sitting.