**WILLIAM C. MITCHELL, LTD., An Iowa Corporation d/b/a Bill Mitchell Swine Service, Appellee,**

v.

**Richard BROWN, Appellant.**

**No. 96–1521.**

Supreme Court of Iowa.

March 25, 1998.

Kenneth R. Munro of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

Richard J. Howes and Ronald L. Anderson of Howes & Anderson, P.C., Des Moines, William Wheatcraft, Des Moines, and Jeanne K. Johnson, Des Moines, for appellee.

SNELL, Justice.

Defendant appeals from a jury verdict in favor of plaintiff on claims of negligence and breach of implied warranty. Defendant contends the district court erred as follows: (1) in submitting plaintiff's claim for breach of implied warranty to the jury; and (2) in instructing the jury on two theories of negligence which defendant contends were unsupported by the record and Iowa law. We affirm.

## I. Background Facts and Proceedings

The plaintiff, William C. Mitchell, Ltd. d/b/a/ Bill Mitchell Swine Service, is a hog breeding company operating primarily in Madison County, Iowa. Defendant Richard Brown, at times pertinent to this case, was a hog breeder operating in Shelby County, Iowa. In the mid–1980s, Brown orally contracted with Mitchell to function as a "multiplier" operation for Mitchell. As a multiplier operation, Brown would purchase boars and gilts at a discount from Mitchell, relocate the animals to his Shelby County farm, mate them, and sell the select offspring to Mitchell for a premium. All of the animals Brown

kept on his farm were either breeding stock sold to him by Mitchell or the offspring of the breeding stock. The animals which Mitchell purchased from Brown were added to the herd at his sales center for sale to third parties for breeding purposes.

In the late summer of 1992, a pseudorabies outbreak occurred in the herd at Mitchell's sales facility. Brown's herd also tested positive for pseudorabies. The outbreak necessitated a quarantine at Mitchell's sales facility beginning in mid-September 1992. Normal operations at the sales center did not resume until April 1993. In September 1994, Mitchell filed a petition against Brown alleging claims of negligence, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. Mitchell contended Brown was negligent in one or more of the following ways: (1) failing to limit or prevent access by unauthorized persons onto Brown's farm; (2) failing to consult with a veterinarian as to the presence or absence of pseudorabies in herds on neighboring farms; (3) failing to follow proper pseudorabies testing procedures. Mitchell also maintained Brown had breached implied warranties by selling him animals infected with pseudorabies. Prior to trial, Mitchell dropped his claim for breach of implied warranty of fitness for a particular purpose.

Brown filed a motion for summary judgment on two grounds. First, he contended that because Mitchell and his two expert witnesses acknowledged during discovery that they had no direct evidence of any negligence on Brown's part, they would not be able to prove negligence at trial. Second, he argued that because Mitchell acknowledged he had been informed prior to purchasing the suspect animals from Brown that Brown's herd had been certified "qualified negative" for pseudorabies by the State of Iowa and that the animals had been in Brown's possession for longer than thirty days, then pursuant to Iowa Code chapter 554A (1991), Brown was immune from Mitchell's claim of breach of implied warranty. The district court denied Brown's motion for summary judgment and the matter proceeded to trial.

At trial, Brown stipulated that the source of the pseudorabies outbreak at Mitchell's operation was gilts sold by Brown to Mitchell in the late summer or early fall of 1992. In an attempt to show Brown's negligence in his disease prevention measures, Mitchell presented evidence regarding two incidents in 1990 when Brown's father, who at that time worked at Brown's breeding facility, failed to follow proper disinfecting procedures. Brown's father's involvement in the breeding facility ceased in 1990; however, he lived at the farm where Brown's breeding operation was located at the time the outbreak occurred. In addition, to show Brown's alleged negligence, Mitchell's experts testified regarding Brown's alleged duty to question his veterinarian about pseudorabies outbreaks at neighboring farms. However, the experts failed to testify conclusively that such a duty existed because they claimed a "confidential" relationship exists between farmers and their veterinarians.

At the close of evidence Brown made a motion for directed verdict which the district court denied. Brown made objections to several of the court's instructions to the jury, which the court overruled. The jury instructions regarding the negligence claim did not separate the three theories of negligence, but stated that the jury must find Brown was negligent in one or more of the three alleged ways. The special verdict form submitted to and completed by the jury did not have separate damage forms for the negligence and breach of implied warranty claims. Rather, damages for the two claims were combined on one special verdict form. The jury returned verdicts for Mitchell on both the negligence and breach of implied warranty claims and set Mitchell's damages at $325,318. Brown filed a motion for judgment notwithstanding the verdict, which the court denied. Brown appealed.

On appeal, Brown argues that no statutory or common law duty exists that required him to consult with his veterinarian about pseudorabies outbreaks on neighboring farms. He also argues insufficient evidence was presented regarding the allegation that he failed to properly control access to his facility for disease prevention purposes. Brown further

contends that he complied with the disclosure requirements of Iowa Code chapter 554A, and is therefore entitled to the exemption from liability for implied warranty provided by that chapter. Mitchell argues that Brown failed to preserve error on his arguments regarding the negligence claims. He also argues Brown did not preserve error on the implied warranty claim. Substantively, Mitchell maintains Brown did not comply with the disclosure requirements set forth in chapter 554A and that, therefore, the implied warranty exemption should not apply.

## II. Discussion

### A. Implied Warranty Claim

#### 1. Preservation of Error

Mitchell claims Brown failed to preserve error regarding the district court's submission of the implied warranty claim. Prior to trial, Brown filed a motion for summary judgment claiming that section 554A.1 provided an absolute defense to the implied warranty claim. The court denied the motion for summary judgment, finding that a genuine issue of fact existed as to whether Brown had fully complied with state disease testing requirements. After the close of evidence, Brown's attorney made a motion for directed verdict regarding the implied warranty claim.

We have given this issue careful consideration and conclude that error was preserved. Brown raised his arguments on this issue in his motion for summary judgment and again via his motion for directed verdict on the implied warranty claim.

#### 2. The Merits

##### a. Chapter 554A—Livestock Warranty Exemption

Iowa Code section 554A.1 provides an exemption from implied warranty claims in livestock sales in certain instances. In 1992, the section provided in pertinent part:

[A]ll implied warranties arising under sections 554.2314 and 554.2315 are excluded from a sale of cattle, hogs, sheep and horses if the following information is disclosed to the prospective buyer or the buyer's agent in advance of the sale, and if

confirmed in writing at or before the time of acceptance of the livestock when confirmation is requested by the buyer or the buyer's agent:

a. That the animals to be sold have been inspected in accordance with existing federal and state animal health regulations and found apparently free from any infectious, contagious, or communicable disease.

b. One of the following, as applicable:

(1) Except when the livestock have been confined with livestock from another source or assembled within the meaning of subparagraph 2, the name and address of the present owner, and whether or not that owner has owned all of the livestock for at least thirty days.

Chapter 554A was enacted by the Iowa legislature in 1980, but it has never been interpreted by our court or the court of appeals. This type of legislation has its roots in the 1960s and 1970s, when courts, after many years of enforcing the doctrine of caveat emptor, began applying the implied warranty provisions of the Uniform Commercial Code to livestock sales, providing a remedy for buyers of diseased livestock. *See Reed v. Bunger*, 255 Iowa 322, 333–34, 122 N.W.2d 290, 297–98 (1963) (holding that in light of enactment of Uniform Commercial Code in Iowa, older decisions based on the rule of caveat emptor were not applicable in livestock sale); *Ver Steegh v. Flaugh*, 251 Iowa 1011, 1023–25, 103 N.W.2d 718, 725–27 (1960) (same); *see generally* Jeanne Ann Foster, Note, *Implied Warranties in the Sale of Diseased Livestock in Iowa; A Return to Caveat Emptor?*, 31 Drake L.Rev. 637 (1981–82). Lobbying groups which supported the enactment of chapter 554A contended that because it is nearly impossible to warrant the health of livestock, implied warranties should be excluded from such sales. *See* Sharon L. Soorholtz, Note, *The Iowa Livestock Warranty Exemption: Illusory Protection for the Buyer*, 67 Iowa L.Rev. 133, 134 (1981) [hereinafter Soorholtz]; *see also* Leah C. Hill, Note, *"A Pig in the Parlor Instead of the Barnyard"? An Examination of Iowa Agricultural Nuisance Law*, 45 Drake L.Rev. 935, 951–58 (1997) (discussing the history of agricultural nuisance law and recent

legislation designed to provide immunity for livestock farmers from nuisance lawsuits).

Some version of a statutory exemption from implied warranties in livestock sales has been enacted in about one-half of the states. *See* J.W. Looney, *Warranties in Livestock, Feed, Seed, and Pesticide Transactions,* 25 U. Mem. L.Rev. 1123, 1134–35 (1995). The statutes can be classified into three basic types. First, are statutes that exempt sellers from the UCC's implied warranties in all situations. These statutes simply state that there are no implied warranties in the sale of livestock.[1] States having such statutes include Georgia, Missouri, Montana, Nebraska, South Dakota, Tennessee, Texas, Utah, and Wyoming. The second category of statutes are those which provide that no implied warranties exist unless the seller knowingly sold animals he knew were sick or diseased.[2] Arkansas, Florida, Kansas, Kentucky, and Ore-gon have this type of statute. The third type of statute provides an exemption from the UCC's implied warranties if certain conditions are met.[3] Under these provisions, the seller usually must show compliance with all state and federal regulations regarding the health of livestock in order to obtain the exemption. States adopting this statutory scheme include: Alabama, Illinois, Indiana, Michigan, Mississippi, North Dakota, Ohio, Oklahoma, Washington, and Wisconsin.

Iowa's statute, with its disclosure requirements, is unique. The closest similarity with the above-listed categories lies with those statutes requiring a showing by the seller that he has complied with all state and federal regulations regarding animal health and disease. However, none of those statutes have a similar disclosure requirement. Furthermore, there are no cases which provide a helpful interpretation or application of any

---

1. *See* Ga.Code Ann. § 11–2–316(3)(d) (1994) (stating that no implied warranties exist in the sale of livestock except for brucellosis detected within thirty days of sale); Mo. Ann. Stat. § 400.2–316(5) (West 1994) (providing that no implied warranties exist in the sale of livestock unless the contract provides for such warranties); Mont.Code Ann. § 30–2–316(3)(d) (1997) (no implied warranties that livestock are free from disease); Neb.Rev.Stat. Ann. § 2–316(3)(d) (1992) (same); S.D. Codified Laws § 57A–2–316.1 (Michie 1997) (same); Tenn.Code Ann. § 47–2–315 (1996) (no implied warranty of fitness for particular purpose); Tex. Bus. & Com. Code Ann. § 2.316(f) (West 1994) (no implied warranties that livestock are free from disease); Utah Code Ann. § 70A–2–316(5) (1997) (stating that if contract for sale of livestock does not contain written implied warranties, there shall be no implied warranty that the livestock are free from disease and sickness); Wyo. Stat. Ann. § 34.1–2–316(c)(v) (Michie 1997) (no implied warranty that livestock are free from disease).

2. Ark.Code Ann. § 4–2–316(3)(d)(ii) (Michie 1991) (granting exemption from implied warranty unless seller knowingly sold sick or diseased animals); Fla. Stat. § 672.316(3)(d) (1997) (same); Kan. Stat. Ann. § 84–2–316(3)(d) (1996) (same); Ky.Rev.Stat. Ann. § 355.2–316(3)(d) (1997) (same); Or.Rev.Stat. § 72.3160(3)(d) (1997) (granting exemption from implied warranty unless seller knew or had reason to know animals were diseased).

3. Ala.Code § 2–15–4 (Supp.1997) (stating that no implied warranty exists that livestock are free from disease provided that all federal and state regulations have been complied with regarding inspection, disease prevention and control); 810 Ill. Comp. Stat. Ann. 5/2–316(3)(d) (West 1993) (providing that implied warranties do not apply when the seller has made a reasonable effort to comply with state and federal regulations regarding animal health; protection does not apply if seller had knowledge of disease at time of sale); Ind.Code Ann. § 26–1–2–316(3)(d) (Michie 1992) (no implied warranty if seller shows compliance with all state and federal regulations regarding animal health); Mich. Comp. Laws Ann. § 440.2316(3)(d) (West 1994) (same); Miss.Code Ann. § 75–2–314(4) (1981) (exemption from implied warranty conditioned upon reasonable showing by seller that all state and federal regulations regarding animal health have been satisfied); N.D. Cent.Code § 41–02–33(3)(e) (1983) (same); Ohio Rev.Code Ann. § 1302.29(C)(4)(a), (b) (Banks–Baldwin 1994) (providing that, except for sales of livestock for immediate slaughter, no implied warranties exist that animal is free from disease; however, there is an implied warranty that the seller has no knowledge or reason to know the animal is not free from disease and that the seller has complied with applicable health rules); Okla. Stat. Ann. tit. 12A, § 2–316(3)(d) (West Supp.1998) (no implied warranty provided seller offers sufficient evidence of compliance with state and federal health regulations); Wash. Rev.Code Ann. § 62A.2–316(3)(d) (West 1995) (no implied warranties exist in sale of livestock if seller has complied with all state and federal laws regarding animal health and disease and seller is not guilty of fraud, deceit, or misrepresentation); Wis. Stat. Ann. § 402.316(3)(c) (West 1995) (no implied warranty exists if seller complied with all state and federal regulations pertaining to animal health unless the seller had knowledge of disease).

other jurisdiction's implied warranty exemption statute.

Also important to the proper resolution of this case are the requirements imposed by the legislature for pseudorabies testing and control. Iowa Code chapter 166D, entitled "Pseudorabies Control," provides standards for testing and treatment of pseudorabies. Evidence at trial showed that Brown's herd had been certified by state veterinarians as "qualified negative." *See* Iowa Code § 166D.7(1). A "qualified negative herd" is defined as:

> [A] herd in which one hundred percent of the herd's breeding swine have reacted negatively to a test, and have not been vaccinated, and which is retested as provided in this chapter.

*Id.* § 166D.2(37).

In order to have the herd recertified as qualified negative, Brown was required to have further testing conducted as follows:

> The herd shall be recertified when either of the following occurs:
>
> (1) Each eighty to one hundred five days at least twenty-five percent of the herd's breeding swine react negatively to a test.
>
> (2) Each month at least ten percent of the herd's breeding swine react negatively to a test.

*Id.* § 166D.7(1)(*a*)(1), (2). The term "breeding swine" is defined as "swine over six months of age." *Id.* § 166D.2(6).

At trial, Mitchell contended that the gilts Brown was selling back to him were not being tested properly. Specifically, Mitchell asserted that not all gilts over six months old were being included in the pseudorabies testing pool at Brown's farm. Brown maintains the fact that the animals might have been incorrectly tested is irrelevant to the applicability of the implied warranty exemption. He contends that "[i]t is not required under 554A that the disclosure be accurate, rather it is only required that a disclosure be made." Brown argues that because he told Mitchell his herd was certified as "qualified negative" the court should have decided the implied warranty claim in his favor as a matter of law

and not submitted the issue to the jury for its consideration.

Thus, the issue before us can be reduced to the meaning of the disclosure requirements imposed by chapter 554A and a determination of what is necessary for a seller to comply with those requirements to obtain the statutory exemption.

### b. Statutory Interpretation

The main point of contention with regard to the interpretation of section 554A.1 is the meaning of the disclosure requirements. The statute provides an exemption to the seller from claims of implied warranty, if certain information "is *disclosed* to the prospective buyer or the buyer's agent in advance of the sale." Iowa Code § 554A.1(1) (emphasis added). Brown contends that this language only requires that the seller state or put in writing the required phrases. He asserts that "[i]t is not required ... that the disclosure be accurate, rather it is only required that a disclosure be made." Therefore, we must determine what the legislature intended by its use of the word "disclose."

 "Absent legislative definition or a particular and appropriate meaning in law, we give words their plain and ordinary meaning." *State v. Ahitow*, 544 N.W.2d 270, 272 (Iowa 1996); *see also* Iowa Code § 4.1(38). We also consider the context in which the words are used. Iowa Code § 4.1(38). We apply rules of statutory construction only when the terms of a statute are ambiguous. *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996). A statute is ambiguous if reasonable persons could disagree as to its meaning. *Id.*; *American Asbestos Training Ctr., Ltd. v. Eastern Iowa Community College*, 463 N.W.2d 56, 58 (Iowa 1990). "Ambiguity may arise in two ways: (1) from the meaning of particular words; or (2) from the general scope and meaning of a statute when all its provisions are examined." *Carolan*, 553 N.W.2d at 887 (quoting *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995)).

 Here, the word "disclose" is not defined by the legislature. We look to dictionaries for guidance in determining the plain

and ordinary meaning of a word. *See State v. Romeo,* 542 N.W.2d 543, 548 (Iowa 1996). *Black's Law Dictionary* defines "disclose" in the following manner: "To bring into view by uncovering; to expose; to make known; to lay bare; to reveal to knowledge; to free from secrecy or ignorance, or make known." Black's Law Dictionary 464 (6th ed.1990). Disclosure is defined by *Black's* as: "Revelation; the impartation of that which is secret or not fully understood." *Id. Webster's* definition is similar: "to open up . . . to expose to view . . . to make known . . .; *esp:* to reveal in words (something that is secret or not generally known)." Webster's Third New Int'l Dictionary 645 (unabr. ed.1993). Within the context of section 554A.1, the most relevant meaning of "disclose" is "to make known."

It is not clear from the dictionary definitions of "disclose," however, whether the legislature intended accuracy or truthfulness to be a required element of proper disclosure. Because reasonable persons may disagree as to whether the word "disclose" encompasses an element of truthfulness, we turn to rules of statutory interpretation. *Carolan,* 553 N.W.2d at 887; *Ahitow,* 544 N.W.2d at 272. Iowa Code section 4.6 lists several factors for the court to consider, among others, in determining the intention of the legislature when terms of a statue are ambiguous:

1. The object sought to be attained.
2. The circumstances under which the statute was enacted.
3. The legislative history.
4. The common law or former statutory provisions, including laws upon the same or similar subjects.
5. The consequences of a particular construction.
6. The administrative construction of the statute.
7. The preamble or statement of policy.

Iowa Code § 4.6. We have said the following in summarizing our duties in interpreting statutes:

> The ultimate goal of statutory construction is to give effect to the intent of the legislature. We cannot, under the guise of construction, enlarge or otherwise change the terms of the statute as the legislature adopted it. We will not construe a statute in a way that would produce impractical or absurd results, . . . and we should not speculate as to the probable legislative intent apart from the wording used in the statute.

*Carolan,* 553 N.W.2d at 887 (citations omitted).

Mindful of the considerations set forth in our statutes and prior cases, we now turn to the matter of interpreting the meaning of the disclosure requirements found in section 554A.1. The language of section 554A.1 remains virtually the same as when it was enacted in 1980. The only changes have been nonsubstantive in nature. There are no administrative code provisions implementing chapter 554A to aid in its interpretation. Likewise, there is no statement of policy or purpose in the statute which would help us in its construction. The factors we are left to consider are more nebulous in nature: the object to be attained by the statute, the circumstances under which the statute was enacted, and the consequences of particular constructions. *See* Iowa Code § 4.6.

We first consider the object to be attained by the enactment of the implied warranty exemption. We can assume the object to be attained in enacting this provision was greater protection for sellers in the sale of livestock. This assumption entails a consideration of the circumstances existing at the time the legislature enacted chapter 554A, another factor to be considered in our analysis. Prior to enactment of the exemption, our court vigorously enforced the rights of buyers in the sale of livestock. *See, e.g., Vorthman v. Keith E. Myers, Enters.,* 296 N.W.2d 772, 776 (Iowa 1980) (refusing to apply "as is" warranty waiver found in sales instrument when buyer sought to recover damages for breach of express and implied warranties for diseased pigs purchased from defendant); *W & W Livestock Enters., Inc. v. Dennler,* 179 N.W.2d 484, 491 (Iowa 1970) (upholding jury verdict for buyer of diseased livestock on claim of breach of implied warranty; noting that buyer was not required to show seller knew of any latent or hidden defects in animals or that all animals were

infected at the time of delivery to sustain claim); *Reed,* 255 Iowa at 334, 122 N.W.2d at 297–98 (finding that seller could be held liable for breach of implied warranty "notwithstanding the seller's lack of knowledge it does not comply with the warranty and the difficulty of discovering this fact," and noting that "[g]ood faith and lack of the seller's negligence are no defense"). By 1980, other states had enacted statutory protection from implied warranty claims for sellers of livestock and some leaders of the livestock industry feared that a lack of such protection in Iowa would lead to a decrease in livestock sales transactions in the state. *See* Soorholtz, 67 Iowa L.Rev. at 134–35.

The statutory scheme also reveals that the legislature still intended for livestock buyers to receive some protection. If the legislature had intended to make a wholesale return to the doctrine of caveat emptor in the arena of livestock sales as it existed before Iowa's adoption of the Uniform Commercial Code and its implied warranty provisions, it could have simply enacted a statute that completely negated implied warranty protection, as some states have chosen to do. However, the legislature chose to maintain some protection for the buyer via the disclosure requirements and we must be cognizant of this expression of intent in our interpretation of the statute.

We also must examine the disclosure requirement in the context of the remainder of the statute. The statute assumes an oral disclosure of the required information, unless the buyer requests written confirmation of the disclosure. *See* Iowa Code § 554A.1(1) ("if confirmed in writing at or before the time of acceptance of the livestock when confirmation is requested by the buyer"). When we examine the meaning of the word "confirm," we find the most applicable meaning to be: "to give new assurance of the truth or validity of." Webster's Third New Int'l Dictionary 476 (unabr. ed.1993). The legislature's use of the word "confirm" is indicative of its intent with regard to its use of the word "disclose." Because the word "confirm" entails an element of truthfulness, we may conclude that the legislature intended a similar meaning for the word "disclose."

Based on our consideration of the factors outlined in Iowa Code section 4.6, we find that the disclosure requirement of section 554A.1 mandates that the information disclosed be truthful and accurate in order to obtain exemption from implied warranty claims. While it is apparent that by its enactment of chapter 554A the legislature intended to provide greater protection to livestock sellers, the form of statute utilized by the legislature is also indicative of an intent to retain some protection for buyers. Interpreting the statute as Brown urges would completely eviscerate implied warranty protection for buyers of livestock. The assertion that the disclosure requirements do not include an element of accuracy and truthfulness would render the disclosure requirements a farce. We must not forget in our interpretation of statutes that our primary goal is to give statutes a reasonable construction which will effectuate rather than defeat the purpose of the statute. *Metier v. Cooper Transp. Co.,* 378 N.W.2d 907, 912 (Iowa 1985). To interpret the disclosure requirements as Brown exhorts would defeat the purpose of the disclosure requirements.

Therefore, we conclude that the disclosure requirements of Iowa Code section 554A.1 mandate a truthful and accurate disclosure of (1) whether the animals "have been inspected in accordance with existing federal and state animal health regulations and found apparently free from any infectious, contagious, or communicable disease" and, in this case, (2) "the name and address of the present owner, and whether or not that owner has owned all of the livestock for at least thirty days." Iowa Code § 554A.1(1)(*a*), (*b*).

Brown contends that this construction of the disclosure requirements would render the written confirmation option superfluous. He argues that the written confirmation language shows the legislature did not intend for the oral disclosure to act as a guarantee. The plain language of the statute, however, belies the construction urged by Brown. The statute states that implied warranties are excluded if the required information is disclosed "and if confirmed in writing at or before the time of acceptance of the livestock

*when* confirmation is requested by the buyer." *Id.* § 554A.1(1) (emphasis added). The statute gives the buyer the option to request written confirmation of the disclosures; however, the statute clearly does not mandate such a request in order for the buyer to receive protection.

Brown also argues that because his veterinarian conducted the testing on the animals at issue, he is not responsible if those tests were conducted incorrectly. Under chapter 166D, however, the onus is clearly on the owner of the animals to ensure the animals are tested properly before obtaining state certification. *See* Iowa Code § 166D.7(1)(*d*) (requiring the owner to request approval or reapproval of a qualified negative herd from the state); *id.* § 554A.1 (requiring owner-seller of animals to warrant that animals have been tested in accordance with state law).

Mitchell argued at trial that Brown failed to abide by these disclosure requirements and that therefore, the sale is not exempt from the implied warranty claim. Mitchell contended that the animals Brown sold to him in the summer of 1992 were not inspected in accordance with state animal health regulations, specifically chapter 166D, the law on testing and treatment for pseudorabies. In his motion for directed verdict, Brown maintained that under his construction of the disclosure requirements, he had fully complied and was thus entitled to a directed verdict on the implied warranty claim. He based this argument on the fact that the parties stipulated that before the sale Brown told Mitchell the herd was certified as "qualified negative." Because we have determined that section 554A.1 requires more than just a facial assertion by the seller for compliance, we conclude that the district court properly denied Brown's motion for directed verdict and submitted this issue for the jury's consideration. Accordingly, we affirm the ruling of the district court on this ground.

B. Negligence Claim

Brown contends that two of the three theories of negligence were improperly submitted for the jury's consideration because of

(1) a lack of duty established via either statute or common law to consult one's veterinarian with regard to the disease status of neighboring livestock herds; and (2) Mitchell's failure to present adequate evidence to support submission of an instruction regarding Brown's alleged failure to monitor access to his breeding facility to prevent disease. We find it unnecessary to reach Brown's contentions on these issues because we conclude that any error in submitting these instructions does not require reversal. *See, e.g., Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 685 (Iowa 1990) (holding that "error in giving or refusing to give a particular instruction does not warrant reversal unless the error is prejudicial").

The court submitted instructions detailing the elements Mitchell was required to prove to prevail on the negligence and implied warranty claims. However, the court submitted only one damage instruction, which was likely intended to cover both claims. Similarly, the special verdict form contained only one question pertaining to damages. There is no discussion in the record as to the court's intent in submitting only one damage instruction. Neither party objected to the damage instruction or to the special verdict form.

We have previously considered the effect of the erroneous submission of a theory of recovery and found in several instances that a wrongful submission does not necessarily constitute reversible error. In *Olson v. Prosoco, Inc.,* 522 N.W.2d 284, 290 (Iowa 1994), a jury returned special verdicts finding the defendant liable on claims of negligence and strict liability. While we concluded that the strict liability claim had been improperly submitted, we found that "[t]he error in the strict liability submission ... does not require reversal." *Olson,* 522 N.W.2d at 290. We noted that reversal may be required when a *general verdict* of liability results from the submission of two or more theories, one of which contained an error in the instructions. *Id.* (citing *Erickson v. Wright Welding Supply, Inc.,* 485 N.W.2d 82, 86 (Iowa 1992); *Gordon v. Noel,* 356 N.W.2d 559, 565 (Iowa 1984)). With a general verdict, it is impossible to determine whether the verdict resulted from a theory that was

free of error. *Id.* The rendering of a special verdict, however, does not present the same type of problem. We concluded in *Olson* that the special verdicts issued by the jury were "sufficiently insulated from each other" so as not to create such a problem. *Id.* We noted that the theories of recovery were separated from each other "both in theory and submission" which insulated the properly-submitted theory from any prejudice. *Id.* Therefore, we upheld the jury verdict in favor of the plaintiff. *Id.*

In *Robinson v. Perpetual Services Corp.,* 412 N.W.2d 562, 568 (Iowa 1987), we considered what effect the alleged improper submission of a negligent misrepresentation claim had on a jury's verdict. Via special verdict forms, the jury found that the elements of fraudulent misrepresentation and negligent misrepresentation had been proven. The damages portion of the special verdict form asked the jury to fix the plaintiffs' damages "for fraudulent or negligent representation or both." *Robinson,* 412 N.W.2d at 568. The defendant failed to object to the damage instruction or the special verdict forms. *Id.* We noted the jury's finding in favor of the plaintiffs on the properly-submitted fraudulent misrepresentation claim and the verdict which incorporated its finding on that claim. We held that the defendant had "no basis for asserting it was harmed when the court submitted the negligent misrepresentation theory to the jury." *Id.*

In *Pollmann v. Belle Plaine Livestock Auction, Inc.,* 567 N.W.2d 405 (Iowa 1997), we again considered the propriety of a jury verdict in light of an improperly-submitted claim. The jury's damage award incorporated findings for the plaintiff on both a breach-of-contract claim and a negligent misrepresentation claim. While we concluded that the breach-of-contract claim should not have been submitted, we upheld the jury's award of damages and refused the defendant's request for a remand for a redetermination of damages under the remaining claim of negligent misrepresentation. *Pollmann,* 567 N.W.2d at 411. We noted that the defendant had failed to object to the district court's instructions on damages and the special verdict forms and stated that the instructions

became the law of the case. We also noted, however, that "[b]ecause the damages [the plaintiff] could recover under his claim of negligent misrepresentation are the same as the damages awarded to him for breach of contract, there is no need to remand this case for a trial on the negligent misrepresentation damages." *Id.*

We conclude that any error in the submission of the negligence theories in this case does not require reversal. As in *Olson,* the claims of negligence and implied warranty were separated in both theory and submission. This separation insulated the implied warranty claim from any prejudicial effect the alleged improper submission of the negligence claim may have had. While the damages portion of the special verdict form in this case did not contain language like the form in *Robinson* directing the jury to award damages for either or both of the claims, the cases are so factually similar that the absence of such a statement does not impact our decision. As in *Robinson* and *Pollmann,* the jury here had two theories of recovery from which to choose which involved essentially the same elements of damages. *Compare* Iowa Code § 554.2714(2), (3) ("The measure of damages for breach of warranty is the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted.... In a proper case any incidental and consequential damages ... may also be recovered."), *with Ballard v. Amana Soc'y, Inc.,* 526 N.W.2d 558, 560 (Iowa 1995) (allowing plaintiffs, in suit to recover damages for injury to swine herd caused by toxic feed corn sold by defendant, to recover not only the market value of the hogs, but other consequential damages). Had the jury completely rejected the negligence claim, it could still have awarded the same amount of damages based on the implied warranty claim. Therefore, even if it was error for the district court to submit the contested theories of negligence, we find that no prejudice resulted from that error based upon the jury's finding on the implied warranty claim.

### III. Summary

We conclude that the district court properly submitted Mitchell's claim for breach of

implied warranty to the jury. Brown's interpretation of the statute as not requiring an accurate disclosure of the seller's compliance with state and federal health regulations is inappropriate. Our interpretation of the statute as requiring truthful and accurate disclosures in order to receive the statutory exemption from implied warranty claims is consistent with the language used by the legislature and the purpose and intent behind the statute. We do not reach Brown's alleged error regarding the district court's submission of two contested theories of negligence because such submission, even if erroneous, does not require reversal. We therefore affirm the judgment of the district court based on breach of an implied warranty.

**AFFIRMED.**

All justices concur except LARSON and TERNUS, JJ., who take no part.